**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| KMCO, LLC, | § | Case No. 20-60028 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

---

**ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF AN
ORDER APPROVING THE SALE OF FACILITIES LOCATED IN CROSBY, TEXAS
FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, ENCUMBRANCES, AND
GRANTING RELATED RELIEF**
**(This Document Relates to Docket No. _____)**

---

Upon consideration of the Chapter 7 Trustee's (the "***Trustee***") *Emergency Motion for Entry of Order Approving the Sale of Facilities Located in Crosby, Texas Free and Clear of Liens, Claims, Interests, and Encumbrances, and Granting Related Relief* (the "**Motion**") the Court finds that it has jurisdiction over the Motion and requested relief pursuant to 28 U.S.C. § 1334 and that venue is proper pursuant to 11 U.S.C. § 1408. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court has statutory and constitutional authority to enter a final order on the Motion. The relief requested in the Motion is in the best interests of the Debtor, its Estate,[1] creditors, stakeholders, and other parties in interest. Objections, if any, to the relief requested in the Motion are hereby withdrawn, waived, settled, or overruled by the Court. Notice of the Motion and any related hearings was sufficient under the circumstances of the case and complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules. Accordingly, no additional notice of the Motion,

---

[1] Capitalized terms not otherwise defined shall have the meaning set forth in the Motion and Agreement of Sale and Purchase, attached as <u>Exhibit 1</u> of the Order.

any related hearings, and this Order is required.  Upon consideration of the Motion, and after hearing and considering all evidence in support of the Motion during proceedings before this Court, the Court finds that good cause exists to grant the requested relief.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

1.          The Trustee is authorized to sell all assets listed in the attached <u>Exhibit 1</u> of this Order (the "**Property**") according to the terms of the Agreement of Sale and Purchase (the "**Agreement**"), including the Real Property (as defined in the Agreement), attached as <u>Exhibit 2</u> of this Order, under section 363(b) of the Bankruptcy Code, provided however, that the assets described in Section 1.1(b)(ix) are excluded from the sale and remain with the estate.

2.          Cadence Bank, N.A. is authorized to pick up any inventory on which it has a valid lien within 30 days of the entry of this Order. The Purchaser and Cadence may amend this deadline by written agreement signed by the parties. In the event that Cadence fails to pick up such inventory within the prescribed period, it shall be deemed to have consented to the sale of the inventory free and clear of any Encumbrances (defined below) and its lien, to the extent valid, shall attach to the proceeds and the proceeds only of the sale.

3.          Mesa Mechanical, Inc. ("**Mesa**") is authorized to take possession of any property that qualifies as a "removable" under Texas law that remain at the Facility and to which Mesa asserts a valid lien within 30 days of the entry of this Order. Prior to removal, Mesa and the Purchaser shall discuss, in good faith, any assertion that property at the Facility constitutes a removable.  To the extent that Mesa and the Purchaser disagree as to what constitutes a removable, the Court shall retain jurisdiction to make a final determination as to the classification of property as a removable subject to Mesa's lien.  Any dispute shall be brought before the Court via motion within 30 days of the entry of this Order. In the event that Mesa does not either take possession of any removables or file the necessary motion for a determination as to the status of any property within the time frame set out in

this Order, Mesa shall be deemed to have consented to the sale and its lien, to the extent valid, shall attach to the proceeds and the proceeds only of the sale.

4.     Pursuant to section 365(f) of the Bankruptcy Code, upon closing, the Property shall be transferred to the Purchaser free and clear of all Encumbrances, known or unknown, save and except those that are specifically assumed under the Agreement.  For the purpose of this Order an Encumbrance shall be defined as:

    a.    Any and all liens, whether consensual or statutory (including mechanic's, materialman's, carrier's, repairer's, contractor's and other similar liens arising under applicable Laws), replacement liens, adequate protection liens or other liens granted under sections 361, 363 or 364 of the Bankruptcy Code, mortgages, deeds of trust, hypothecations, pledges, security interests, charges, options and transfer restrictions, including without limitation, rights of first refusal or first offer, defect or objection liens, easements, encroachments or servitudes, in each case, that constitutes an "interest" for purposes of Bankruptcy Code § 363(f), including without limitation those charges or interests in property within the meaning of "lien" under Bankruptcy Code § 101(37) or any other limitation, restriction or interest that constitutes an "interest" for the purposes of Bankruptcy Code § 363(f);

    b.    any and all claims, causes of actions, payments, charges, judgments, assessments, losses, monetary damages, penalties, fines, fees, interest obligations, deficiencies, debts, obligations, costs and expenses and other liabilities (whether absolute, accrued, contingent, fixed or otherwise, or whether known or unknown, or due or to become due or otherwise), including any amounts paid in settlement, interest, court costs, costs of investigators, attorneys' fees, legal or other expenses incurred in connection therewith.

5.     With respect to each creditor, person, or entity asserting an Encumbrance, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Each interested party, creditor, person, or other entity asserting any Encumbrance in the Property has: (i) subject to the terms and conditions of this Order, consented to the proposed sale of Property or is deemed to have consented; (ii) has asserted an Encumbrance that is subject to a bona fide dispute as set forth in section 363(f)(4) of the Bankruptcy Code; or (iii) could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  Within 10 days from entry of this Order,

BSP, Cadence, and all holders[2] of statutory liens against the Property shall execute and deliver to Trustee a release of any and all Encumbrances on the Property (as defined in the Agreement) listed in Exhibit 1 of this Order.

6.    To the extent that any interest holder of an Encumbrance has objected to the relief requested in the Motion or the proposed sale, any such objection is denied pursuant to one or more of the subsections of section 363(f) of the Bankruptcy Code.

7.    Upon closing, the Purchaser shall not be deemed to: (i) be the successor of Seller or the Estate; (ii) have, *de facto* or otherwise, merged with or into Seller or the Estate; (iii) be a mere continuation or substantial continuation of Seller or the Estate or the enterprise of Seller or the Estate; or (iv) be liable for any acts or omissions of Seller or the Estate in the conduct of the Business or arising under or related to the Property other than as set forth in the Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in the Agreement, the Parties intend that Purchaser shall not be liable for any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances, as defined in the Agreement) against Seller or the Estate or any of Seller's or the Estate's predecessors or affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Property or any liabilities of Seller or the Estate arising prior to the Closing Date. Without limiting the foregoing, Purchaser shall not assume or be responsible for any environmental, health and safety obligations or liabilities that are not attached or tied to the Real Property and that are otherwise personal to Seller or the Estate, such as liabilities arising from the off-site disposal of hazardous substances, fines, penalties

---

[2]    For the avoidance of doubt, the following parties have asserted statutory liens against the property: Chube's Equipment Co.; DeJean Company; Gator Specialty Services, LLC; Majesty Investments, LLC; Mesa Mechanical, Inc.; U.S. Fire Pump Company, LLC.

or other sanctions imposed on Seller or the Estate as a consequence of Seller's or the Estate's pre-Closing violations of law, or liabilities associated with personal injury or death attributed to Seller's or the Estate's pre-Closing actions or omissions

8.      The relief granted in paragraph 7 shall not apply to liabilities or obligations that are attached to and run with the Property.  The Purchaser acquires the Property in its present condition and must perform all required obligations necessary to comply with all applicable permits, governmental authorizations, and other requirements that pertain to the ownership and operation of the Property purchased.

9.      The sale of Property is undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Buyer has acted without collusion. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the sale of the Property to the Purchaser.  The Purchaser is a buyer in good faith of the Property and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

10.      Effective upon Closing, the transfer of the Debtor's right, title, and interest in the Property to the Purchaser, pursuant to the Agreement, shall be, and hereby is deemed to be, a legal, valid and effective transfer of the right, title, and interest in Property, and vests with or will vest in the Purchaser all right, title, and interest of the Debtor in Property, free and clear of all Claims, Encumbrances, and Liabilities.

11.      In the event of any inconsistency between this Order and the Motion, this Order shall govern in all respects.

12.      The Trustee is authorized to take all actions necessary to effectuate the relief granted under this Order.

13.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

14.     The terms and conditions of this Order shall be immediately effective and enforceable upon entry, and to the extent applicable, Bankruptcy Rule 6004(h) is waived.

15.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

# Exhibit 1

*Execution Version*

**AGREEMENT OF SALE AND PURCHASE**

**BETWEEN**

**KMCO, LLC,**
**a Delaware limited liability company,**
**AS SELLER**

**AND**

**ALTIVIA OXIDE CHEMICALS, LLC,**
a **Delaware Limited Liability Company,**
**AS PURCHASER**

**May 8, 2020**

## Table of Contents

ARTICLE 1  SALE AND PURCHASE .................................................................1
   1.1  Agreement of Sale and Purchase ........................................1
   1.2  Excluded Assets ...............................................................3
   1.3  Permitted Encumbrances ...................................................4
   1.4  Assumed Liabilities ..........................................................5
   1.5  Purchase Price ..................................................................5
ARTICLE 2  TITLE AND SURVEY .................................................................5
   2.1  Commitment for Title Insurance ........................................5
   2.2  Survey .............................................................................6
   2.3  Owner's Title Policy at Closing .........................................6
ARTICLE 3  CLOSING .................................................................................6
   3.1  Time and Place .................................................................6
   3.2  Seller's and Estate's Obligations at Closing........................6
   3.3  Purchaser's Obligations at Closing .....................................7
   3.4  Closing Costs; Expenses ...................................................8
   3.5  Allocation of Purchase Price .............................................8
ARTICLE 4  REPRESENTATIONS, COVENANTS AND DISCLAIMERS...............9
   4.1  Representations of Seller ..................................................9
   4.2  Representations of Purchaser ............................................12
   4.3  Certain Other Covenants and Agreements.........................15
   4.4  Employees and Employee Benefits ...................................18
   4.5  Bankruptcy Actions .........................................................19
   4.6  Disclaimers Regarding Environmental Matters...................21
ARTICLE 5  CLOSING CONDITIONS .............................................................22
   5.1  Conditions to Parties' Obligations ....................................22
   5.2  Conditions to Purchaser's Obligations...............................22
   5.3  Conditions to Seller's and the Estate's Obligations............24
ARTICLE 6  TERMINATION ..........................................................................24
   6.1  Termination.....................................................................24
   6.2  Procedures Upon Termination; Effect of Termination .........26
ARTICLE 7  COMMISSIONS ..........................................................................26
   7.1  Broker or Finders .............................................................26
   7.2  Notice to Purchaser .........................................................26
ARTICLE 8  CONDEMNATION AND CASUALTY LOSS ...................................27
   8.1  Condemnation..................................................................27
   8.2  Casualty Loss..................................................................27
ARTICLE 9  MISCELLANEOUS ......................................................................28
   9.1  Notices.............................................................................28
   9.2  Modification.....................................................................29
   9.3  Time of Essence...............................................................30
   9.4  Binding Effect; Assignment..............................................30
   9.5  Exhibits and Schedules ....................................................30
   9.6  Entire Agreement .............................................................30
   9.7  Further Assurances..........................................................30

## TABLE OF CONTENTS

9.8     Counterparts ..................................................................................................31
9.9     Severability ...................................................................................................31
9.10    Choice of Law; Submission to Jurisdiction; Waiver of Jury Trial .......................31
9.11    Joint Drafting ................................................................................................32
9.12    Section Headings ..........................................................................................32
9.13    Office of Foreign Assets Control (OFAC)......................................................32
9.14    Survival of Representations and Warranties....................................................32
9.15    Bulk Sales Laws............................................................................................32

EXHIBITS:

A:     Description of the Land
B:     Form of Special Warranty Deed
C:     Form of Bill of Sale and Assignment
D:     Form of FIRPTA Affidavit
E:     Disclosure Schedules

## ALPHABETICAL LIST OF DEFINITIONS

| Term | Section No. or Definition |
|---|---|
| Active Employees | 4.4(a) |
| Agreement | Preamble |
| Alternative Transaction | 4.5(a)(i)(A) |
| Ancillary Documents | 4.1(b) |
| Assigned Avoidance Actions | 1.1(b)(ix) |
| Assumed Liabilities | 1.4(a) |
| Avoidance Actions | 1.1(b)(ix) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | 4.5(a)(i)(B) |
| Bankruptcy Court | Recitals |
| Bill of Sale and Assignment | 3.2(b) |
| Blocked Persons | 9.13 |
| Business | 1.2(c) |
| Casualty Loss | 8.2 |
| Closing | 3.1 |
| Closing Date | 3.1 |
| Closing Date Deadline | 4.5(a)(i)(C) |
| Committee | 4.5(a)(i)(D) |
| Disclosure Schedules | 4.1 |
| Deed | 3.2(a) |
| Effective Date | Preamble |
| Encumbrance | 1.1 |
| Estate | Recitals |
| Excluded Assets | 1.2 |
| Executive Order | 9.13 |
| Exhibits | 9.5 |
| Final Order | 4.5(a)(i)(E) |
| FIRPTA Affidavit | 3.2(c) |
| Fraud | 4.1(n) |
| Hired Active Employees | 4.4(b)(i) |
| Inventory | 1.1(b)(ii) |
| Knowledge | 4.1(e) |
| Land | 1.1 |
| List | 9.13 |
| Material Adverse Effect | 4.1(a) |
| OFAC | 9.13 |
| Other Assets | 1.1(a) |
| Owner's Policy | 2.3 |
| Parties | Preamble |
| Permitted Encumbrances | 1.3 |
| Petition Date | 4.5(a)(i)(F) |

| | |
|---|---|
| Property | 1.1 (at end) |
| Purchase Price | 1.5 |
| Purchaser | Preamble |
| Real Property | 1.1 |
| Representatives | 4.3(a) |
| Sale Order | 4.5(a)(i)(G) |
| Sale Order Deadline | 4.5(a)(i)(H) |
| Seller | Preamble |
| Survey | 2.2 |
| Title Commitment | 2.1 |
| Title Company | First American Title Insurance Company |
| Trustee | Recitals |
| Upfront Payment | 1.5 |

## AGREEMENT OF SALE AND PURCHASE

THIS AGREEMENT OF SALE AND PURCHASE (this "Agreement") is made and entered into as of May 8, 2020 (the "Effective Date") by and between KMCO, LLC, a Delaware limited liability company ("Seller"), and ALTIVIA Oxide Chemicals, LLC, a Delaware limited liability company ("Purchaser") (Seller and Purchaser together hereafter referred to as the "Parties", which term shall also include, following the filing of the Bankruptcy Case and subject to the approval of this Agreement by the Trustee, the Estate and the Trustee).

## W I T N E S E T H:

**WHEREAS**, on or immediately following the Effective Date, Seller will file a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

**WHEREAS**, pursuant to the Bankruptcy Case, all assets of the Seller will become assets of the Seller's Chapter 7 bankruptcy estate (the "Estate"); and

**WHEREAS**, pursuant to the Bankruptcy Case, the Bankruptcy Court will appoint a Chapter 7 bankruptcy trustee to oversee and administer the Estate (the "Trustee"); and

**WHEREAS**, the Parties, subject in all respects to Trustee and Bankruptcy Court approval and the terms and conditions of this Agreement, desire for (i) the Estate to sell to Purchaser, and Purchaser to purchase from the Estate, the Property (as defined below), and (ii) the Estate to assign to Purchaser, and Purchaser to assume from the Estate, the Assumed Liabilities (as defined below); and

**WHEREAS**, the board of managers of Seller has determined that it is advisable and in the best interests of Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to the Trustee's and Bankruptcy Court's approval and entry of the Sale Order (as defined below), and has approved the same.

**NOW, THEREFORE**, in consideration of the mutual covenants, agreements, and warranties contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## SALE AND PURCHASE

1.1 <u>Agreement of Sale and Purchase</u>. Pursuant to the Bankruptcy Code and subject to the terms and conditions hereinafter set forth, including approval of the Trustee and Bankruptcy Court, and for the consideration stated herein, at the Closing, the Estate will sell to Purchaser and Purchaser will purchase from the Estate the following, free and clear of any lien, encumbrance, pledge, mortgage, deed of trust, security interest, charge, claim, easement, restriction, restrictive

covenant, lease, license, encroachment, overlapping of improvements, matrimonial or community interest, option, right of first offer or of first refusal, tenancy by the entirety claim or other title defect, interest, or restriction of any kind (collectively, an "<u>Encumbrance</u>"), other than Permitted Encumbrances:

(a)     all of the Estate's tracts or parcels of land located in Crosby, Harris County, State of Texas, and described on <u>Exhibit A</u> attached hereto and made a part hereof for all purposes (the "<u>Land</u>"), together with all existing improvements situated thereon, and all rights, tenements, hereditaments, easements, appendages, ways, privileges, minerals, royalties and appurtenances pertaining thereto, including any right, title and interest of the Estate in and to the adjacent streets, alleys and rights-of-way (the Land and the other properties described in this subparagraph (a) are herein called the "<u>Real Property</u>");

(b)     all of the Estate's right, title and interest in and to all other property and assets of Seller to the extent such assets and properties exist as of the Closing Date, including the following (but excluding the Excluded Assets) (collectively, the "<u>Other Assets</u>"):

(i)     all tangible personal property of Seller, including those items described in <u>Schedule 1.1(i)</u>;

(ii)     all inventories of Seller, including all raw materials, work-in-process, finished goods, merchandise, products under research and development, demonstration equipment, office and other supplies, parts, packaging materials and other accessories related thereto that are held at, or are in transit from or to, the Real Property, or located at any supplier's, agent's or customer's premises, on consignment or otherwise, together with any and all rights of Seller against any suppliers of such inventories (the "<u>Inventory</u>");

(iii)     all approvals, consents, ratifications, waivers, authorizations, licenses, registrations or permits issued, granted, given or otherwise made available to Seller by or under the authority of any governmental or regulatory agency or body or pursuant to any law and any pending application therefore or renewal thereof, in each case to the extent transferable to Purchaser, including those listed in <u>Schedule 1.1(iii)</u>;

(iv)     all rights of Seller under express or implied guarantees, warranties, representations, covenants, rights, claims, counterclaims, defenses, credits, rebates, causes of action or rights of set off against third parties related to the Property or the Assumed Liabilities, to the extent transferable to Purchaser;

(v)     all motor vehicles owned by Seller, including automobiles, trucks and other rolling stock, and including without limitation those listed on <u>Schedule 1.1(v)</u>;

(vi)     all trademarks, service marks, trade names, and similar indicia of source of origin, all registrations and applications for registration thereof, and the goodwill connected with the use of and symbolized by the foregoing; copyrights and all registrations and applications for registration thereof; trade secrets and know-how; patents and patent applications; internet domain name registrations; and other intellectual property and related proprietary rights), in each case that is owned by Seller;

(vii)     all telephone and fax numbers and email addresses related to the Business;

(viii)    all rights under non-disclosure, confidentiality and similar arrangements with (or for the benefit of) employees or agents of Seller or with third parties; and

(ix)     all avoidance claims or causes of action under the Bankruptcy Code or applicable law (including, without limitation, any preference or fraudulent conveyance claims or causes of action), and all other claims or causes of action under any other provision of the Bankruptcy Code or applicable law, in each case belonging to Seller ("Avoidance Actions"), but solely to the extent against Purchaser or any of its affiliates or subsidiaries (if any) (the "Assigned Avoidance Actions").

The Real Property and the Other Assets are herein collectively referred to as the "Property".

1.2     Excluded Assets. Notwithstanding anything to the contrary contained in Section 1.1 or elsewhere in this Agreement, the following assets of Seller and/or the Estate are not part of the sale and purchase contemplated hereunder, are excluded from the Property, and Seller and the Estate shall reserve and retain, on its own behalf, all of the following assets after the Closing (collectively, the "Excluded Assets"):

(a)     all cash, cash equivalents and short-term investments;

(b)     all accounts receivable;

(c)     all files, documents, instruments, papers, books and records of Seller or the Estate (financial or otherwise), including without limitation, financial statements, tax returns and related work papers and letters from accountants, budgets, pricing guidelines, ledgers, journals, deeds, title policies, tax returns, minute books, stock certificates and books, company seals, stock transfer ledgers, contracts, customer lists, computer files and data, operating data and plans and environmental studies and plans, all employee-related or employee benefit related files or records, other than personnel files of Hired Active Employees, any other books and records relating to the Excluded Assets and/or liabilities of Seller or the Estate and any other books and records that Seller or the Estate is prohibited from disclosing or transferring to Purchaser under applicable law or contract or which Seller or the Estate is required by applicable law to retain; provided, however, Seller shall, subject to approval by the Trustee, make available to Purchaser from time to time, promptly upon  Purchaser's written request, all papers, books, and records referred to above and in the Seller's or Estate's possession, custody or control that may be proximately related to the operation of the business operated by Seller immediately prior to the Effective Date and contemplated to be continued by Purchaser after the Closing (the "Business"), it being understood and agreed that all such papers, books, and records made available to Purchaser are to be used exclusively by Purchaser for the Business, and Purchaser shall maintain the confidentiality of all such papers, books, and records using reasonable measures at least as protective as Purchaser uses to protect its own confidential information;

(d)     all contracts of Seller or the Estate;

(e)     all tax assets, including claims for any refund of taxes and other governmental charges of whatever nature on behalf of Seller (or any of its affiliates) or the Estate;

(f)     all claims, causes of action, manufactures' and contractors' warranties and other rights of Seller or the Estate that relate exclusively to any Excluded Assets or liabilities which are not Assumed Liabilities, including, for the avoidance of doubt, any claims or causes of action related to the April 2, 2019 incident at the Real Property;

(g)     all Avoidance Actions and all other claims or causes of action under any other provision of the Bankruptcy Code or applicable law that are not Property pursuant to Section 1.1;

(h)     all insurance policies and all rights to applicable benefits, claims and proceeds thereunder;

(i)     all rights in connection with and assets of Seller's employee benefit plans;

(j)     all rights of Seller or the Estate under this Agreement and the other agreements entered into by Seller or the Estate in connection with this Agreement;

(k)     all retainers held by any professionals employed by Seller or the Estate, including any carve-outs for professional fees and expenses;

(l)     all documents and instruments and other data or information of Seller or the Estate that may be protected by an attorney-client privilege or work product; and

(m)     all rights to any action, suit or claim of any nature available to or being pursued by Seller or the Estate, whether arising by way of counterclaim or otherwise, in each case, that are not Property pursuant to Section 1.1, and including, for the avoidance of doubt, any claims or causes of action related to the April 2, 2019 incident at the Real Property.

1.3     Permitted Encumbrances.  The Property shall be conveyed subject to the following matters (hereinafter referred to collectively as the "Permitted Encumbrances"):

(a)     the prior reservation of all minerals, if any, appearing of record, in or in favor of any party other than Seller or one or more of its affiliates;

(b)     the matters described in Schedule B of the Title Commitment (other than pre-printed exceptions);

(c)     Assumed Liabilities;

(d)     property taxes for 2019;

(e)     property taxes for the year in which Closing occurs and subsequent years, not yet due or payable;

(f)     statutory liens or other Encumbrances for taxes not yet due and payable;

(g)     inchoate materialman's, mechanic's, repairman's, employee's, contractor's, operator's and other similar Encumbrances securing amounts not yet due and payable;

(h)     Encumbrances arising by, through or under Purchaser's financing for the transactions contemplated hereby, if any; and

(i)     other Encumbrances to the extent required pursuant to Section 363 of the Bankruptcy Code;

provided, however, that, notwithstanding the foregoing, in no event shall "Permitted Encumbrances" include any lien, pledge, mortgage, deed of trust, security interest, mechanics' or materialmen's liens, or any other monetary lien of any kind or character (other than the lien for property taxes for 2019 in *clause (d)* above and the "inchoate" liens set forth above in *clauses (e)*, *(f)*, and *(g)* and in those described in *clause (h)* above).

1.4     Assumed Liabilities.

(a)     Effective as of the Closing, Purchaser shall only assume the liabilities of Seller and the Estate expressly set forth on Schedule 1.4(a) (the "Assumed Liabilities").

(b)     Except for the Assumed Liabilities, Purchaser shall not assume, and shall not be deemed to have assumed, any other liability or obligation of Seller or the Estate of whatever nature (whether arising prior to, or at the time of, or subsequent to the Closing, and whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect), and Seller and the Estate shall retain responsibility for any and all such liabilities and obligations that are not Assumed Liabilities.  For the avoidance of doubt, the assumption by Purchaser of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

1.5     Purchase Price.     The aggregate consideration for the sale and transfer of the Property to Purchaser and the transactions contemplated hereunder (the "Purchase Price") shall be (i) the payment by Purchaser to the Estate of $25,000 (the "Upfront Payment") immediately after entry of the Sale Order, and (ii) the assumption of the Assumed Liabilities at the Closing.  For the avoidance of doubt, Purchaser shall have no liability with respect to any costs, fees or expenses of any nature incurred by Seller or the Estate following the Closing Date.  Concurrent with the execution of this Agreement, Purchaser shall deposit the Upfront Payment in the trust account of the Purchaser's attorney to hold in trust for delivery to the Trustee pending entry of the Sale Order.

ARTICLE II
TITLE AND SURVEY

2.1     Commitment for Title Insurance.  Prior to the Effective Date, Seller delivered to Purchaser Seller's latest available Owner Policy of Title Insurance and Loan Policy of Title Insurance.  As soon as practicable after the Effective Date, Purchaser shall cause Republic Title of Texas, Inc., as agent for First American Title Insurance Company (the "Title Company") to issue an updated title commitment, together with copies of all title exception documents disclosed therein (collectively, the "Title Commitment") covering the Real Property, showing all matters affecting title to the Real Property.

2.2     Survey.  Prior to the Effective Date, Seller delivered to Purchaser a copy of the latest available on the ground survey regarding the Real Property (the "Survey"), which Survey was performed and completed on the Land and certified by a registered public surveyor.

2.3     Owner's Title Policy at Closing.  In the event that the Title Company does not issue to Purchaser at Closing, or unconditionally commit at Closing to issue to Purchaser (subject only to the payment of the applicable premiums and other charges for the issuance thereof) an owner's policy of title insurance (the "Owner's Policy"), insuring Purchaser's fee simple title to the Real Property, subject only to (a) the standard exceptions and exclusions from coverage contained in such policy that may not be deleted pursuant to applicable law, and (b) the specific exceptions to title shown on Schedule B to the Title Commitment, and in all events (i) without taking any exceptions for any monetary liens of any kind or character other than the lien for property taxes for 2019 and 2020 and subsequent years, and (ii) without taking an exception for unfiled mechanics' liens (it being expressly agreed by Purchaser, however, that it shall not be a condition to Purchaser's obligations to close that any particular modifications or endorsements be issued to the Owner's Policy), Purchaser shall have the right to terminate this Agreement, in which case the parties hereto shall have no further rights or obligations, other than those that by their terms survive the termination of this Agreement.

ARTICLE III
CLOSING

3.1     Time and Place.  Subject to the conditions stated in this Agreement, the transfer by Seller and the Estate to Purchaser of the Property and the assignment by Seller and the Estate to Purchaser of (and the assumption by Purchaser of) the Assumed Liabilities (the "Closing") shall take place at 10:00 a.m. Central Time at the offices of the Trustee as soon as practicable after the date on which the conditions set forth in ARTICLE V have been satisfied or waived (other than those conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction of such conditions as of the Closing).  The date on which the Closing occurs is the "Closing Date".  The Closing will be deemed effective as of 12:01 a.m. Central Time on the Closing Date.

3.2     Seller's and Estate's Obligations at Closing.  At Closing, Seller and the Estate shall:

(a)     deliver to Purchaser a Special Warranty Deed in substantially the form of Exhibit B attached hereto (the "Deed") and made a part hereof for all purposes, executed and acknowledged by the Trustee (on behalf of the Estate) and in recordable form, conveying the Real Property to Purchaser free and clear of all Encumbrances to the maximum extent permitted by the Bankruptcy Code, except the Permitted Encumbrances;

(b)     deliver to Purchaser a General Conveyance, Bill of Sale and Assignment and Assumption Agreement in substantially the form of Exhibit C attached hereto (the "Bill of Sale and Assignment") and made a part hereof for all purposes, executed by the Trustee (on behalf of the Estate) and transferring to Purchaser, without warranty of condition or title, the Other Assets;

(c)     deliver to Purchaser a FIRPTA affidavit in the form of Exhibit D attached hereto (the "FIRPTA Affidavit") and made a part hereof for all purposes, duly executed by the Trustee

(on behalf of the Estate), stating that the Estate is not a "foreign person" as defined in the federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act, and in the event the Estate is unable or unwilling to deliver the FIRPTA Affidavit, in lieu thereof the funds payable to the Estate shall be adjusted in such a manner as to comply with the withholding provisions of such statutes;

(d)     deliver to Purchaser certificates of title to all motor vehicles, trailers and other similarly titled equipment or rolling stock included in the Other Assets, duly endorsed for transfer by the Trustee (on behalf of the Estate) to the Purchaser as of the Closing Date;

(e)     deliver to Purchaser possession of the Property, including the Inventory;

(f)     deliver to Purchaser such evidence as Purchaser's counsel may reasonably require as to the authority of the person or persons executing documents on behalf of Seller or the Estate;

(g)     deliver to Purchaser a certified copy of the Sale Order;

(h)     deliver to Purchaser copies of all instruments, certificates, documents and other filings (if applicable) necessary to release the Property from all Encumbrances (other than Permitted Encumbrances), including any applicable UCC termination statements, all in form reasonably satisfactory to Purchaser, and including for the avoidance of doubt the release of any and all Encumbrances on the Property held by BSP Agency, LLC or Cadence Bank, N.A.;

(i)     deliver to Purchaser evidence satisfactory to Purchaser that all claims asserted against Seller or the Estate related to the Business pursuant to Section 503(b)(9) of the Bankruptcy Code have been satisfied by Seller or the Estate or will be satisfied by Seller or the Estate;

(j)     execute, acknowledge and deliver such instruments as are reasonably requested by the Title Company in order to issue the Owner's Title Policy in the form required by this Agreement and/or to effectuate the conveyance of the Real Property, in each case in form and substance reasonably acceptable to Trustee (on behalf of the Estate), including, without limitation, a customary form of (i) affidavit of debts, liens and possession and (ii) survey affidavit of no change with respect to the Survey, and the agreed-upon closing statements generated by the Title Company; and

(k)     execute, or acknowledge its acceptance, and deliver to Purchaser any other documents contemplated herein to be provided to Purchaser by the Trustee (on behalf of the Estate) or reasonably requested by Purchaser.

3.3     <u>Purchaser's Obligations at Closing</u>.  At Closing, Purchaser shall:

(a)     deposit into escrow with the Title Company, by wire transfer of immediately available funds, the amounts shown as being due from Purchaser on the final, agreed-upon closing statements prepared by the Title Company;

(b)     deliver to Trustee the Bill of Sale and Assignment executed by Purchaser, assuming the Assumed Liabilities;

(c)     deliver to Trustee such evidence as the Trustee may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser;

(d)     execute, acknowledge and deliver such instruments as are reasonably requested by the Title Company in order to issue the Owner's Title Policy in the form required by this Agreement and/or to effectuate the conveyance of the Real Property, in each case in form and substance reasonably acceptable to Purchaser, including, without limitation, the agreed-upon closing statements generated by the Title Company; and

(e)     execute, or acknowledge its acceptance, and deliver to Trustee any documents contemplated herein to be provided to Seller or the Trustee (on behalf of the Estate) by Purchaser or reasonably requested by the Trustee.

3.4     <u>Closing Costs; Expenses</u>.  Except as otherwise specifically provided herein, all fees, costs, and expenses incurred by the Parties in negotiating this Agreement or in consummating the transactions contemplated by this Agreement shall be paid by the Party incurring the same, including legal and accounting fees, costs, and expenses.  Without limiting the foregoing, Seller or the Estate (as applicable) shall pay (i) the cost of obtaining and recording any releases of lien or similar instruments and any other fees charged by the holder or holders of the existing Encumbrances affecting the Property (other than Permitted Encumbrances) in order to discharge and release the Property from all such Encumbrances (other than Permitted Encumbrances), and (ii) its own attorneys' fees.  Purchaser shall pay (i) one hundred percent (100%) of the escrow fee charged by the Title Company, (ii) the basic premium for the Owner's Policy and any additional coverages or endorsements to the Owner's Policy, (iii) the recording fees for the Deed, (iv) its own attorneys' fees, and (v) the cost of any updates to the Survey (which Purchaser may obtain in Purchaser's sole discretion).

3.5     <u>Allocation of Purchase Price</u>. For purposes of complying with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended, the Purchase Price shall be allocated in accordance with the fair market value of the Property as provided in the consideration allocation schedule attached hereto as <u>Schedule 3.5</u>; provided, however, that for purposes of such allocation schedule and tax matters, the Purchase Price shall exclude future performance obligations that are not fixed in amount as of the Closing Date and any contingent liabilities. Purchaser and Seller agree to prepare their respective federal, state and foreign income tax returns for all current and future tax reporting periods and file IRS Form 8594 (and corresponding state forms) with respect to the transfer of the Property to Purchaser in a manner consistent with such allocation; <u>provided</u>, <u>however</u>, that if, in any audit of any tax return of a Party, the fair market values are finally determined to be different from those shown on <u>Schedule 3.5</u>, the Parties may (but shall not be obligated to) take any position or action consistent with the fair market values as finally determined.  If any state, federal or foreign taxing authority challenges such allocation, the Party receiving notice of such challenge shall give the other prompt written notice of such challenge, and the Parties shall cooperate in good faith in responding to it in order to preserve the effectiveness of the allocation.

ARTICLE IV
REPRESENTATIONS, COVENANTS AND DISCLAIMERS

4.1     Representations of Seller.  Except as may be set forth in the Disclosure Schedules attached hereto as Exhibit E (the "Disclosure Schedules") (it being understood that if Seller discovers that certain events or circumstances have occurred that cause one or more of the following representations or warranties to become untrue or inaccurate such that the condition set forth in Section 5.2(a) cannot be, or would be reasonably expected not to be, satisfied, Seller will promptly inform Purchaser in writing of such discovery), Seller represents and warrants to Purchaser as of the Effective Date as follows:

(a)     Organization and Qualification.  Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Seller has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, subject to the provisions of the Bankruptcy Code.  Seller has previously delivered to Purchaser complete and correct copies of its organizational documents, as amended and in effect on the Effective Date.  Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of the Business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.  For purposes of this Agreement, "Material Adverse Effect" means any event, change, occurrence or state of facts that has had, or is reasonably likely to have, individually or in the aggregate, a material adverse effect on (i) the Property, the Assumed Liabilities, or the Business, taken as a whole, provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (A) changes in the U.S. economy or capital markets in general (including any changes resulting from the novel coronavirus) but that do not have a materially disproportionate effect on Seller relative to other participants in the industry in which Seller conducts the Business, (B) changes that affect generally the industry in which Seller operates (including any changes resulting from the novel coronavirus) but that do not have a materially disproportionate effect on the Business relative to other participants in such industry, (C) changes after the Effective Date in any applicable law or United States generally accepted accounting principles as in effect from time to time ("GAAP") or (D) the commencement of the Bankruptcy Case; or (ii) the ability of Seller to consummate the transactions contemplated hereby pursuant to the terms of this Agreement.

(b)     Authorization of Agreement.  Subject to approval of the Trustee and the entry of the Sale Order, Seller has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  For purposes of this Agreement, "Ancillary Documents" means any certificate, agreement, document or other instrument (other than this Agreement) to be executed and delivered by a Party in connection with the consummation of the transactions contemplated by this Agreement.  The execution and delivery of this Agreement and each of the Ancillary Documents to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Seller, subject in all respects to the approval of

the Trustee and the entry of the Sale Order.  This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other Parties, approval of the Trustee and the entry of the Sale Order) this Agreement constitutes, and each Ancillary Document to which it is a party when so executed and delivered (assuming the due authorization, execution and delivery by the other parties thereto and by the Trustee, as applicable) will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Subject to approval of the Trustee and entry of the Sale Order, except (i) for entry of the Sale Order, (ii) for notices, filings and consents required in connection with the Bankruptcy Case and (iii) for the notices, filings and consents set forth on Schedule 4.1(b), Seller is not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any person (including any governmental authority) in connection with the execution and delivery of this Agreement and each of the Ancillary Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, other than such filings, notices or consents the failure of which to make or obtain would not have a Material Adverse Effect.

(c)     Conflicts; Consents; Compliance with Law.   The execution, delivery and performance by Seller of this Agreement or any Ancillary Document to which it is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by Seller of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of its organizational documents.  Except (i) for the approval of the Trustee and entry of the Sale Order, and (ii) as set forth on Schedule 4.1(c)(i), no filing with, notice to or consent from any person is required in connection with the execution, delivery and performance by Seller of this Agreement or the Ancillary Documents to which it is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the taking by Seller of any other action contemplated hereby or thereby, other than such filings, notices or consents, the failure of which to make or obtain would not have a Material Adverse Effect.  Except as set forth on Schedule 4.1(c)(ii), Seller is in compliance, in all material respects, with all applicable laws.  Except as set forth on Schedule 4.1(c)(iii), Seller has not received any outstanding written notice from any governmental authority regarding any actual or possible material violation of, or failure to comply in any material respect with, any law. Seller is not in default in any material respect of any order, writ, injunction, judgment or decree applicable to the Business or the Property.

(d)     Title.  Except for Permitted Encumbrances or as set forth on Schedule 4.1(d), Seller has good title to or, in the case of property leased or licensed by Seller, a valid leasehold interest or license in or all rights to use all of the Property and, at the Closing, Purchaser, pursuant to the Sale Order, shall acquire good and marketable title or, in the case of property leased or licensed by the Seller, a valid leasehold interest or license, in, and under all of such Property, in each case free and clear of all claims, liabilities or Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) to the fullest extent permissible under Sections 363(f) and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006.

(e)     Real Property.  Other than the Real Property, Seller does not own any interest in, nor does Seller lease or license from any third party, any real property.  Seller has not been served with process in any condemnation or similar proceeding affecting the Real Property or any portion thereof, and Seller has not received any written notice and has no Knowledge that any such proceeding is contemplated by any governmental authority.  For purposes of this Agreement, "Knowledge" means the actual knowledge of a natural person or, with respect to a person that is not a natural person, the actual knowledge of the officers or managers of such person, in each case, after due inquiry.  Except as disclosed on Schedule 4.1(e), no person other than Seller occupies or leases, or has any license or similar right with respect to, any portion of the Real Property, and no person other than Seller is in possession of the Real Property or any portion thereof, and no person has any option, right of first refusal, right of first offer, with respect to the Real Property or any portion thereof, or other right to acquire the Real Property or any portion thereof other than Purchaser pursuant to this Agreement.  Prior to the Effective Date, Seller has delivered to Purchaser a true and correct copy of the most recent owner's and loan policies of title insurance with respect to the Real Property and the most recent Survey in respect of the Real Property.

(f)     Tangible Personal Property.  Schedule 4.1(f) sets forth all leases of personal property relating to the personal property used by Seller or to which Seller is a party or by which the properties or assets of Seller or bound.  Seller has a valid and enforceable leasehold interest under each such personal property lease.

(g)     Litigation.  Except as set forth on Schedule 4.1(g) and other than in connection with the Bankruptcy Case, there is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the Knowledge of Seller, threatened against or relating to Seller or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, could reasonably be expected to adversely affect the ability of Seller to enter into this Agreement or to consummate the transactions contemplated hereby and Seller has no Knowledge of any existing grounds on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

(h)     Permits.  Except as set forth on Schedule 4.1(h), Seller is in compliance with all permits and licenses issued by any governmental authority and currently used by Seller in the operation of the Business, except for any noncompliance that would not have a Material Adverse Effect.

(i)     Taxes; Tax Returns.  Seller has filed or will file when due all tax returns pertaining to all federal, state and local income, franchise, sales, use, payroll, excise, business, license and other taxes with respect to its operation of the Business or the ownership of the Property for all periods prior to the Closing Date.  Except for any taxes included in the Assumed Liabilities, Seller has paid or will pay all taxes owed with respect to the Business or the ownership of the Property for all periods prior to the Closing Date.

(j)     Employees; Labor Matters.  Seller has provided Purchaser with a true, complete and correct list of Seller's employees as of the Effective Date, specifying their position, FLSA classification, annual salary, target bonus opportunity, value of accrued but unused vacation time, date of hire and current leave status.  Seller is in compliance in all material respects with all laws

-11-

relating to the employment of, classification of, and termination of employment of its employees. Seller is not a party to any labor or collective bargaining agreement or similar arrangement with respect to its employees and there are no representation or certification proceedings or petitions seeking a representation election presently pending or, to the Knowledge of Seller, threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving Seller, nor have there been any such proceedings in the last three years.

(k)     Tax Status.  Seller is not and has never been a "foreign person" within the meaning of Sections 1445(f)(3) and 7701(a)(30) of the Internal Revenue Code of 1986, as amended.

(l)     Brokers.  Seller has incurred no responsibility, liability or expense, contingent or otherwise, for brokers' fees or finders' fees, agent's commissions or other similar forms of compensation relating to the transactions contemplated by this Agreement or the transaction documents for which Purchaser or Purchaser's affiliates shall have any responsibility.

(m)     Environmental Matters.  Seller has provided Purchaser with access to complete and accurate copies of all environmental, health and safety reports, audits, assessments, studies and other material documents or correspondence addressing environmental, health and safety matters pertaining to the Real Property and Other Assets that are within Seller's possession or control and that have been prepared within the five (5) years preceding the date of this Agreement.  Except as set forth on Schedule 4.1(m), to the Knowledge of Seller, the Real Property and Other Assets are in compliance with all environmental, health and safety laws and regulations in all material respects, and are not subject to any order, notice, claim or other legal proceeding pertaining to environmental, health and safety matters that remains pending or unresolved.

(n)     No Other Representations or Warranties.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS PROVIDED IN THIS AGREEMENT OR ANY CERTIFICATE OR DOCUMENT DELIVERED PURSUANT TO THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR ANY MATTER RELATING TO THE PROPERTY, THE BUSINESS OR THE ASSUMED LIABILITIES.  WITHOUT LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PROPERTY OR THE ASSUMED LIABILITIES. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE FOREGOING LIMITATIONS SHALL NOT APPLY TO, AND NOTHING HEREIN SHALL LIMIT, PURCHASER'S REMEDIES IN THE EVENT OF FRAUD.  For purposes of this Agreement "Fraud" means, with respect to any person, such person's making of a representation or warranty contained in this Agreement, (i) which representation is made (A) with such person's actual knowledge or belief of the falsity of such representation or warranty and (B) with an intent by such person to deceive another party to this Agreement with respect to the making of such representation or warranty; and (ii) such other person relies upon such false representation or warranty and is damaged by such reliance.

4.2     Representations of Purchaser.  Except as may be set forth in the Disclosure Schedules (it being understood that if Purchaser discovers that certain events or circumstances

have occurred that cause one or more of the following representations or warranties to become untrue or inaccurate such that the condition set forth in Section 5.3(a) cannot be, or would be reasonably expected not to be, satisfied, Purchaser will promptly inform Seller in writing of such discovery), Purchaser represents and warrants to Seller as of the Effective Date as follows:

(a)     Organization and Qualification.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  At the Closing, Purchaser shall be duly licensed or qualified to do business as a foreign limited liability company in the State of Texas.  Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, except as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

(b)     Authority.  Purchaser has the requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, to consummate the transactions contemplated hereby and thereby and to assume and perform the Assumed Liabilities.  The execution and delivery of this Agreement by Purchaser and each of the Ancillary Documents to which it is a party, the performance by Purchaser of its obligations hereunder and thereunder, the consummation of the transactions contemplated hereby and thereby and the assumption and performance of the Assumed Liabilities have been duly and validly authorized by all necessary actions on the part of Purchaser.  This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by Purchaser.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Documents by Seller and subject to the approval of the Trustee and effectiveness of the Sale Order, this Agreement constitutes, and each Ancillary Document to which Purchaser is a party when so executed and delivered will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(c)     No Inconsistent Obligations.  Neither the execution and delivery of this Agreement or any other documents contemplated hereby, nor the consummation of the transactions contemplated herein or therein in accordance with the Sale Order, will result in a violation or breach of, or constitute a default under, (i) the organizational documents of Purchaser, (ii) any applicable ruling or order of any governmental authority, (iii) any term or provision of any contract or agreement to which Purchaser or any of its assets or properties is or are bound, (iv) any writ, order, judgment, decree, law, rule, regulation or ordinance applicable to Purchaser or any of its assets or properties, or (v) any other commitment or restriction to which Purchaser is a party.

(d)     Conflicts; Consents.  The execution, delivery and performance by Purchaser of this Agreement or any Ancillary Document to which it is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by Purchaser of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of its organizational documents.  Subject to the approval of the Trustee and effectiveness of the Sale Order, no consent,

-13-

waiver, approval, order or authorization of, or registration, qualification, designation or filing with any person or governmental authority is required in connection with the execution, delivery and performance by Purchaser of this Agreement or the Ancillary Documents to which it is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the assumption and performance of the Assumed Liabilities or the taking by Purchaser of any other action contemplated hereby or thereby, other than such filings, notices or consents, the failure of which to make or obtain would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to perform its obligations under this Agreement and the Ancillary Documents to which it is a party, to assume and perform the Assumed Liabilities or to consummate on a timely basis the transactions contemplated hereby or thereby

(e)    <u>Litigation</u>.   To Purchaser's Knowledge, there are no actions, suits, claims, investigations, hearings, or proceedings of any type pending or threatened against Purchaser challenging the legality of the transactions contemplated in this Agreement (other than with respect to any objection which may be filed in connection with the Bankruptcy Case), except as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchaser's ability to consummate the transactions contemplated hereby.  There are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to Purchaser's Knowledge, threatened against Purchaser or any affiliate of Purchaser, and Purchaser is not insolvent or generally not paying its debt when they become due.

(f)    <u>Sufficiency of Funds</u>.  Purchaser has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated hereunder, to satisfy the Assumed Liabilities and to pay on a timely basis all costs required to be paid by Purchaser under this Agreement as and when due from and after the Closing.

(g)    <u>Brokers</u>.  Purchaser has incurred no responsibility, liability or expense, contingent or otherwise, for brokers' fees or finders' fees, agent's commissions or other similar forms of compensation relating to the transactions contemplated by this Agreement or the transaction documents for which Seller, the Trustee or Seller's affiliates shall have any responsibility.

(h)    <u>Investigation</u>.  Purchaser is sophisticated in the evaluation, purchase, ownership and operation of petrochemical properties and related facilities. In making its decision to enter into this Agreement and the Ancillary Documents to which it is or will be a party and to consummate the transaction contemplated hereby and thereby, except to the extent of Seller's express representations and warranties in <u>Section 4.1</u>, Purchaser has relied on its own independent investigation and evaluation of the Property, which investigation and evaluation was done by Purchaser and its own legal, tax, economic, environmental, engineering, geological and geophysical advisors. In entering into this Agreement, Purchaser acknowledges that it has relied solely upon the aforementioned investigation and evaluation and not on any factual representations or opinions of Seller or any representatives or consultants or advisors engaged by or otherwise purporting to represent Seller or any affiliate of Seller (except the specific representations and warranties of Seller set forth in <u>Section 4.1</u>). Purchaser hereby acknowledges that, other than the representations and warranties made in <u>Section 4.1</u>, neither Seller nor any representatives, consultants or advisors of Seller or its affiliates make or have made any representation or warranty,

-14-

express or implied, at law or in equity, with respect to the Property.  Notwithstanding the foregoing, the limitations and disclaimers set forth in this Section 4.2(h) shall not apply to, and nothing herein shall limit, Purchaser's remedies in the event of Fraud.

(i)    No Other Representations or Warranties.  SELLER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS PROVIDED IN THIS AGREEMENT OR ANY CERTIFICATE OR DOCUMENT DELIVERED PURSUANT TO THIS AGREEMENT, PURCHASER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR ANY MATTER RELATING TO THE PROPERTY, THE BUSINESS OR THE ASSUMED LIABILITIES.  THE FOREGOING LIMITATIONS SHALL NOT APPLY TO, AND NOTHING HEREIN SHALL LIMIT, SELLER'S REMEDIES IN THE EVENT OF FRAUD.

4.3    Certain Other Covenants and Agreements.

(a)    Access to Information.  Seller agrees that, between the Effective Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with ARTICLE VI, Purchaser shall be entitled, through its officers, employees, legal counsel, accountants and other authorized representatives, agents and contractors ("Representatives"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, employees, accountants, auditors, counsel and operations of Seller as Purchaser's Representatives may reasonably request, subject to  the Trustee's reasonable approval.  Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances.  Subject in all respects to the reasonable approval of the Trustee, Seller shall use commercially reasonable efforts to cause its Representatives to reasonably cooperate with Purchaser and Purchaser's Representatives in connection with such investigations and examinations, and Purchaser shall use its commercially reasonably efforts to cause its Representatives to reasonably cooperate with Seller, the Trustee and their Representatives (as applicable) to minimize any disruption to the Business.

(b)    Reasonable Efforts; Cooperation.

(i)    Subject to the other provisions hereof, including, for the avoidance of doubt, reasonable approval of the Trustee, and unless this Agreement is terminated in accordance with its terms, each Party shall use its commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, or advisable under applicable law to cause the transactions contemplated herein to be effected as soon as practicable in accordance with the terms hereof and shall cooperate in a commercially reasonable manner with each other Party and its Representatives in connection with any step required to be taken as a part of its obligations hereunder.  In connection with and subject to the foregoing, the Seller or the Estate shall, as applicable and subject to the reasonable approval of the Trustee, use commercially reasonable efforts to cause, and to cause its employees and agents to, assist and cooperate with the Purchaser, at no incremental cost or expense to the Seller, the Estate or the Trustee, in helping ensure an orderly transition of all governmental licenses and permits from the Seller or the Estate (as applicable) to the Purchaser in connection with the Business and

solely to the extent any such governmental licenses and/or permits may be transitioned to the Purchaser.

(ii)    The obligations of Seller and the Estate pursuant to this Section 4.3(b) shall be subject to reasonable approval of the Trustee and compliance with any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and each of Seller's, the Estate's and the Trustee's obligations to comply with any order of the Bankruptcy Court (including the Sale Order).

(c)    Notification of Certain Matters.  Subject to reasonable approval of the Trustee, Seller or the Estate (as applicable) shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to Trustee, of (i) any notice or other communication from any person alleging that the consent of such person is or may be required in connection with the transactions contemplated by this Agreement or the Ancillary Documents and which is not likely to be obtained, (ii) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of the approval of the Bankruptcy Court and (iii) the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by Seller, the Estate or Purchaser (as applicable) or by any of their respective affiliates (as the case may be), from any third party and/or any governmental authority with respect to the transactions contemplated by this Agreement.

(d)    Preservation of Records.  Subject to reasonable approval of the Trustee, Seller and the Estate (as applicable) and Purchaser agree that each of them shall preserve and keep the books and records held by it relating to the pre-Closing Business for the period commencing on the Effective Date and ending on the earlier of (i) such date on which an orderly wind-down of the Seller's operations and liquidation of the Estate has occurred in the reasonable judgment of the Trustee and (ii) the 12-month anniversary of the Effective Date, and during such period each Party shall make such books and records available to the other Parties (and permit such other Party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such Party in connection with, among other things, any insurance claims by, legal proceedings, or tax audits against or governmental investigations of Seller, the Estate or Purchaser or in order to enable Seller, the Estate or Purchaser to comply with its or their respective obligations under this Agreement and each other agreement, document, or instrument contemplated hereby or thereby.  In the event any Party wishes to destroy such records during such period, such Party shall first provide ten (10) business days' prior written notice to the other, and such other Party shall have the right, at its option and expense, to take possession of such records within five (5) business days after notice thereof.

(e)    Publicity.  No Party shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party hereto and the Trustee, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser, Seller or the Trustee, disclosure is otherwise required by applicable law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or any of its affiliates lists securities, provided that the Party intending to make such release shall use its commercially reasonable efforts consistent with such

applicable law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

(f)    No Successor Liability.  The Parties intend that, except where expressly prohibited under applicable law, upon the Closing, Purchaser shall not be deemed to:  (i) be the successor of Seller or the Estate; (ii) have, *de facto* or otherwise, merged with or into Seller or the Estate; (iii) be a mere continuation or substantial continuation of Seller or the Estate or the enterprise of Seller or the Estate; or (iv) be liable for any acts or omissions of Seller or the Estate in the conduct of the Business or arising under or related to the Property other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Purchaser shall not be liable for any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) against Seller or the Estate or any of Seller's or the Estate's predecessors or affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Property or any liabilities of Seller or the Estate arising prior to the Closing Date.  Without limiting the foregoing, Purchaser shall not assume or be responsible for any environmental, health and safety obligations or liabilities that are not attached or tied to the Real Property and that are otherwise personal to Seller or the Estate, such as liabilities arising from the off-site disposal of hazardous substances, fines, penalties or other sanctions imposed on Seller or the Estate as a consequence of Seller's or the Estate's pre-Closing violations of law, or liabilities associated with personal injury or death attributed to Seller's or the Estate's pre-Closing actions or omissions.  The Parties agree that the provisions substantially in the form of this Section 4.3(f) shall be reflected in the Sale Order.

(g)    Conduct of Business of Seller.  Subject in all respects to the Bankruptcy Court's entry of an order to permit the Trustee to operate the Business pending the Closing and to reasonable approval of the Trustee, Seller hereby covenants with Purchaser that subsequent to the Effective Date and until the Closing, Seller and the Estate will use commercially reasonable efforts, except as otherwise required, authorized or restricted by the Trustee or pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, to (a) operate the Business in the ordinary course of business, (b) maintain the Property (normal wear and tear excepted), and (c) continue to operate the Business and Property in all material respects in compliance with all laws applicable to the Business and Seller.  Further, from and after the Effective Date, subject in all respects to the Bankruptcy Code or an order of the Bankruptcy Court and reasonable approval of the Trustee:

(i)    Seller and the Estate shall not sell, lease, transfer or otherwise dispose of any of the Property;

(ii)    Seller and the Estate shall not permit, allow or suffer any of the Property to be subjected to any Encumbrance other than Permitted Encumbrances;

(iii)    Seller and the Estate shall not remove any personal property (including the Inventory) included in the Other Assets from the Real Property other than in the ordinary course of business;

(iv)     Seller and the Estate shall not waive or release any claim or rights expressly included in the Property, except for adjustments to the value of Inventory in the ordinary course of business;

(v)     solely with respect to any tax liabilities expressly included in the Assumed Liabilities, Seller and the Estate shall not make or change any applicable tax election with respect to such taxes, file any amended tax return with respect to such taxes, enter into any closing agreement with respect to such taxes, settle any tax claim or assessment with respect to such taxes, surrender any right to claim a refund of such taxes, consent to any extension or waiver of the limitation period applicable to any tax claim or assessment for such taxes, incur any liability for such taxes outside the ordinary course of business, prepare or file any tax return for such taxes in a manner inconsistent with past practice, or adopt or change any accounting method in respect of such taxes; and

(vi)     Seller and the Estate shall not agree or commit to do any of the foregoing.

4.4     Employees and Employee Benefits.

(a)     Information on Active Employees.  For the purpose of this Agreement, the term "Active Employees" shall mean all employees employed on the Effective Date by Seller who perform services at the Real Property.

(b)     Offers of Employment to Active Employees by Purchaser.

(i)     Schedule 4.4(b) contains a list of Active Employees to whom Purchaser intends to make an offer of employment to be effective on the Closing Date (the "Hired Active Employees").  Effective immediately before the Closing, Seller (or the Estate, as applicable) will terminate the employment of all of the Hired Active Employees who have accepted offers of employment with Purchaser.  Neither Seller nor any of its affiliates shall solicit the employment of any Hired Active Employee after the Closing.

(ii)     It is understood and agreed that (A) any offer of employment by Purchaser to Hired Active Employees is contingent upon Purchaser's satisfaction with background checks, employment eligibility verification, and other general procedures of Purchaser relating to the hiring of employees, (B) Purchaser's expressed intention to extend offers of employment as set forth in this section shall not constitute any commitment, contract or understanding (expressed or implied) of any obligation on the part of Purchaser to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that Purchaser may establish pursuant to individual offers of employment, and (C) employment offered by Purchaser is "at will" and may be terminated by Purchaser or by an employee at any time for any reason (subject to any written commitments to the contrary made by Purchaser to an employee and any applicable law).  Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Purchaser to terminate, reassign, promote or demote any of the Hired Active Employees after the Closing or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such employees.

-18-

(iii)    Seller or the Estate, as applicable, shall be responsible for the payment of any severance payment, final wages or benefits that become due to any current or former employee, officer, director, member, partner or independent contractor as a result of the employment termination of such individual by Seller or the Estate, as applicable.  Seller or the Estate, as applicable, shall be responsible for all legally mandated health care continuation coverage for its current and former employees (and their qualified beneficiaries) who had or have a loss of coverage due to a "qualifying event" (within the meaning of Section 603 of ERISA) which occurred or occurs on or prior to the Closing Date including, without limitation, any loss of coverage that results directly or indirectly from the transactions contemplated by this Agreement.

(iv)    On and following the Effective Date, subject in all respects to reasonable approval of the Trustee, Seller (or the Estate) and Purchaser shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by this <u>Section 4.4</u>, including exchanging information and data relating to workers' compensation, employee benefits and employee benefit plan coverage, and in obtaining any governmental approvals required hereunder, except as would result in the violation of any applicable law, including without limitation, any law relating to the safeguarding of data privacy.

(c)    <u>No Transfer or Assumption of Employee Plans</u>.  Purchaser shall not assume any obligations under or liabilities with respect to any of Seller's or the Estate's employee benefit plans.

(d)    <u>No Third Party Beneficiaries</u>.  The provisions of this <u>Section 4.4</u> are for the sole benefit of the Parties to this Agreement only and shall not be construed to grant any rights, as a third party beneficiary or otherwise, to any person who is not a Party to this Agreement, nor shall any provision of this Agreement be deemed to be the adoption of, or an amendment to, any employee benefit plan, as that term is defined in Section 3(3) of ERISA, or otherwise to limit the right of Purchaser, Seller or the Estate (as applicable) to amend, modify or terminate any such employee benefit plan. Nothing herein, expressed or implied, shall confer upon any employee of Seller or the Estate (including any Hired Active Employee) any rights or remedies (including, without limitation, any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of any provision of this Agreement.

4.5    <u>Bankruptcy Actions</u>.

(a)    <u>General</u>.

(i)    <u>Certain Definitions</u>.  As used in this Agreement, the following terms shall have the meanings set forth below:

(A)    "<u>Alternative Transaction</u>" means any negotiations or substantive discussions or agreements or arrangements in connection with any asset sale, stock sale, merger, debt for equity swap, joint venture, financing, reorganization, recapitalization or transfer (including the filing of a plan of reorganization with the Bankruptcy Court) of any convertible debt, convertible equity or warrants the effect of which, individually or in the aggregate, is the direct or indirect transfer of a material portion of the Property or the direct or indirect transfer of the ability to effectuate a change of control of the ownership of all or substantial portion of the

Property, or any similar transaction that does not involve, or delays or deters, a sale of the Property to Purchaser.

(B) "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 100, et seq.

(C) "Closing Date Deadline" means July 7, 2020.

(D) "Committee" means the Official Committee of Unsecured Creditors, if any, appointed in the Bankruptcy Case.

(E) "Final Order" means an order which has not been reversed, vacated, stayed, modified, or amended and as to which (i) the time to appeal or petition for review, rehearing, certiorari, reargument, or retrial has expired and no appeal, motion for rehearing or reconsideration, or a petition for writ of certiorari is pending or (ii) any appeal, motion for rehearing or reconsideration, or a petition for writ of certiorari has been finally decided and no further appeal, motion for rehearing or reconsideration, or a petition for writ of certiorari can be taken or granted.

(F) "Petition Date" means the date of the filing of the Chapter 7 petition of Seller.

(G) "Sale Order" means the proposed Final Order of the Bankruptcy Court, in a form to be mutually agreed between Purchaser and the Trustee and to be entered by the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, which Final Order, among other things, shall: (A) approve (x) the execution, delivery and performance by Seller, the Estate and the Trustee (as applicable) of this Agreement, (y) the sale of the Property to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (z) the performance by each of Seller, the Estate and Trustee (as applicable) of its obligations under this Agreement; and (B) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to Seller, and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code.

(H) "Sale Order Deadline" means June 8, 2020.

(ii) At the commencement of the Bankruptcy Case, Seller shall request that the Trustee file with the Bankruptcy Court a motion seeking approval of (x) a private sale of the Property to Purchaser and the assignment of the Assumed Liabilities to Purchaser, in each case in accordance with the Bankruptcy Code, the Sale Order and the terms and conditions of this Agreement, and (y) the authority of the Trustee to operate the Business in the interim between (1) filing of the Bankruptcy Case and (2) the earlier of the Closing Date or the Closing Date Deadline. Purchaser recognizes and acknowledges that the Trustee may take actions that are not contemplated by this Agreement and the Bankruptcy Court, in its discretion, may not enter the Sale Order.

(b) Bankruptcy Matters. Seller and Purchaser acknowledge that this Agreement and the sale of the Property (and the assumption and assignment of the Assumed Liabilities) are subject

to the Trustee's and the Bankruptcy Court's approval.  Seller and Purchaser further acknowledge that Purchaser must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to the Assumed Liabilities.

(c)     503 Liabilities.  From and after the Effective Date and through the Closing, Seller (or the Estate, as applicable) shall pay all administrative expense claims of Seller (or the Estate) to the extent they (i) arise following the Petition Date, and (ii) relate solely to the Property and are allowed pursuant to Section 503(b)(1) of the Bankruptcy Code.

4.6     **Disclaimers Regarding Environmental Matters**.  **IN ADDITION TO, AND ACCUMULATIVE OF, ALL OTHER NOTICES AND DISCLAIMERS OF SELLER SET FORTH IN THIS AGREEMENT AND IN THE SPECIAL WARRANTY DEED, EXCEPT AS EXPRESSLY SET FORTH HEREIN OR IN THE SPECIAL WARRANTY DEED, SELLER EXPRESSLY DISCLAIMS ANY AND ALL REPRESENTATIONS OR WARRANTIES (EXPRESS OR IMPLIED) CONCERNING THE PRESENCE OR THE CONDITION OF HAZARDOUS MATERIALS OR HAZARDOUS SUBSTANCES ON ALL OR ANY PART OF THE REAL PROPERTY, OR WITH RESPECT TO THE COMPLIANCE OF ALL OR ANY PART OF THE REAL PROPERTY OR THE OTHER ASSETS AND THE IMPROVEMENT, OCCUPANCY AND ENJOYMENT THEREOF WITH ANY LAW OR GOVERNMENTAL REGULATION WITH RESPECT TO HEALTH OR THE ENVIRONMENT, INCLUDING, WITHOUT LIMITATION, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, THE RESOURCE CONSERVATION AND RECOVERY ACT OF 1976, AS AMENDED, THE ENDANGERED SPECIES ACT (16 U.S.C. §1531, ET SEQ.), AS AMENDED, THE CLEAN WATER ACT OF 1977, AS AMENDED, THE SAFE DRINKING WATER ACT (42 U.S.C §300, ET SEQ.), AS AMENDED, THE TEXAS WATER CODE, AS AMENDED, THE TEXAS NATURAL RESOURCE CODE, AS AMENDED, AND THE TEXAS SOLID WASTE DISPOSAL ACT, AS AMENDED.**

**PURCHASER FURTHER STIPULATES THAT (i) THE RIGHTS OF INSPECTION TO BE AFFORDED TO PURCHASER UNDER THIS AGREEMENT ARE ADEQUATE AND THAT PURCHASER HAS BEEN AFFORDED THE OPPORTUNITY TO INSPECT (WHETHER OR NOT PURCHASER AVAILS ITSELF OF SUCH OPPORTUNITY), AND (ii) AT AND UPON THE CLOSING, PURCHASER WILL BE DEEMED TO HAVE UNCONDITIONALLY AND IRREVOCABLY WAIVED ANY CLAIM AGAINST SELLER ARISING FROM (A) ANY UNDERGROUND STORAGE TANK OR ANY OTHER OBJECT ON THE REAL PROPERTY OR THE NONCOMPLIANCE THEREWITH UNDER ANY LAW OR GOVERNMENTAL REGULATION, OR (B) THE PRESENCE OF ANY HAZARDOUS MATERIALS OR HAZARDOUS SUBSTANCES ON ALL OR ANY PART OF THE REAL PROPERTY, THE OTHER ASSETS OR THE POST-CLOSING NONCOMPLIANCE OF THE REAL PROPERTY, THE OTHER ASSETS OR ANY PART THEREOF, AND USE, OCCUPANCY AND ENJOYMENT THEREOF, WITH ANY LAW OR GOVERNMENTAL REGULATION, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS BASED ON DIMINUTION OF VALUE OF ALL OR ANY PART OF THE REAL PROPERTY OR THE OTHER ASSETS.**

EXCEPT AS EXPRESSLY SET FORTH HEREIN OR IN THE SPECIAL WARRANTY DEED, EFFECTIVE AT AND UPON THE CLOSING, PURCHASER HEREBY RELEASES, ACQUITS AND FOREVER DISCHARGES SELLER FROM ANY AND ALL CAUSES OF ACTION, CLAIMS AND LIABILITIES OF WHATEVER NATURE, EXISTING, FUTURE, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, RELATED TO OR ARISING FROM ANY ENVIRONMENTAL CONDITIONS OR CONTAMINANTS PRESENT IN, UNDER, ON, OR ABOUT THE PROPERTY PRIOR TO CLOSING.

NOTWITHSTANDING THAT A FORM OF DEED MAY BE ATTACHED TO THIS AGREEMENT AND/OR REFERENCED HEREIN, NO WARRANTY OF TITLE CONTAINED IN SUCH DEED IS INTENDED TO BE INCORPORATED INTO OR MADE A PART OF THIS AGREEMENT.

THESE DISCLAIMERS SHALL SURVIVE THE CLOSING OF THE TRANSACTIONS HEREIN CONTEMPLATED AND THE EXECUTION AND DELIVERY OF THE SPECIAL WARRANTY DEED AND OTHER ANCILLARY DOCUMENTS, AND SHALL NOT BE MERGED THEREIN.

ARTICLE V
CLOSING CONDITIONS

5.1     Conditions to Parties' Obligations.  The obligations of Purchaser (on the one hand) and Seller and the Estate (on the other hand) under this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived in writing by Purchaser or by Trustee (on behalf of Seller and the Estate) (in each case only as to itself), as applicable:

(a)     Governmental and Trustee Approvals.  All authorizations, consents, filings and approvals, in each case from the Trustee, the Bankruptcy Court or any governmental authority, necessary to permit the Parties to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to the Parties, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.  All terminations or expirations of waiting periods imposed (and any extension thereof) by any governmental authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

(b)     No Order.  No order shall have been issued prior to or at the Closing by the Bankruptcy Court or any other governmental authority restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

5.2     Conditions to Purchaser's Obligations.  The obligations of Purchaser under this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived in writing by Purchaser:

(a)     Accuracy of Representations and Warranties.  Each of the representations and warranties set forth in Section 4.1 (as qualified by the related portions of the Disclosure Schedules) shall be true and correct in all material respects (without giving effect to any materiality or similar

qualification therein), in each case as of the Effective Date (in each case except for those representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date).

(b)     Performance of Covenants.  Seller and the Estate (each as applicable) shall have performed and complied in all material respects (without giving effect to any materiality or similar qualification therein) with the obligations and covenants required by this Agreement to be performed or complied with by Seller and the Estate on or prior to the Closing Date.

(c)     No Proceeding.  No proceeding shall be pending before any governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement.

(d)     Bankruptcy Condition.

(i)     The Sale Order shall be in form and substance satisfactory to Purchaser in its sole discretion, shall have been entered on the docket of the Bankruptcy Court no later than the Sale Order Deadline and shall have become a Final Order.

(ii)     The Sale Order shall approve and authorize the assumption and assignment of the Assumed Liabilities such that the Assumed Liabilities will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Purchaser, among other things, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing.

(iii)     Nothing in this Agreement shall preclude Purchaser (on the one hand) or Seller and the Estate (on the other hand) from consummating the transactions contemplated herein if Purchaser, in its sole discretion, waives the requirement that the Sale Order shall have become a Final Order.  No notice of such waiver of this or any other condition to Closing need be given except to the Trustee and any official committee appointed in the Bankruptcy Case (including the Committee), it being the intention of the Parties hereto that Purchaser shall be entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of a Final Order.

(e)     Additional Information.  Any updates to the Disclosure Schedules Purchaser has received from Seller or the Estate containing updated information shall be satisfactory to Purchaser in its sole discretion.

(f)     Adverse Changes.

(i)     There shall have been no material adverse change in the matters reflected in the Title Commitment, nor any additional exceptions to title to the Real Property added to the Title Commitment.

(ii)     Any update to the Survey obtained by Purchaser shall not disclose (a) any matters with respect to the Real Property in addition to those matters reflected in the Survey delivered by Seller, or (b) any change in the existing matters reflected in the Survey delivered by Seller, that

would, in any such case, reasonably be expected to materially and adversely affect the status of title to the Real Property.

(g) <u>Closing Deliveries</u>.   Seller or the Estate (by action of the Trustee) shall have delivered to Purchaser the items set forth in <u>Section 3.2</u> of this Agreement.

(h) <u>Settlement Agreements</u>.   Purchaser shall have entered into settlement agreements, on terms Purchaser determines, in its sole and exclusive discretion, are satisfactory, with Harris County and Crosby Independent School District in respect of the Assumed Liabilities relating to Seller's 2019 property tax liabilities.

5.3 <u>Conditions to Seller's and the Estate's Obligations</u>.   The obligations of Seller and the Estate under this Agreement are subject to the satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived in writing by the Trustee:

(a) <u>Representations</u>.   The representations and warranties of Purchaser set forth in <u>Section 4.3</u> shall be true and correct in all material respects (without giving effect to any materiality or similar qualification therein), in each case as of the Effective Date (in each case except for those representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date).

(b) <u>Performance of Covenants</u>.   Purchaser shall have performed and complied in all material respects (without giving effect to any materiality or similar qualification therein) with the obligations, agreements and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

(c) <u>Trustee and Bankruptcy Court Approval</u>.   The Trustee shall have approved and the Bankruptcy Court shall have entered an order (which may be the Sale Order) approving the Closing that is a Final Order.

(d) <u>Closing Deliveries</u>.   Purchaser shall have delivered to Trustee the items set forth in <u>Section 3.3</u> of this Agreement.

ARTICLE VI
TERMINATION

6.1 <u>Termination</u>.   This Agreement may be terminated prior to the Closing as follows:

(a) by written agreement of Purchaser and the Trustee;

(b) by Purchaser, by written notice to the Trustee, if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby

(c) (i) by Purchaser (<u>provided</u> <u>that</u> Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein), by written notice to Trustee, if there shall have been a material breach or material misrepresentation of any of the

representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of Seller or the Estate (as applicable) which breach is not cured within ten (10) days following written notice from Purchaser to Trustee or which breach is willful or deliberate, or there shall have occurred a Casualty Loss; or (ii) by Trustee (provided that Seller or the Estate (as applicable) is not then in material breach of any representation, warranty, covenant or other agreement contained herein), by written notice to Purchaser, if there shall have been a material breach or material misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of Purchaser, which breach is not cured within ten (10) days following written notice from Trustee to Purchaser or which breach is willful or deliberate;

(d)     by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein), by written notice to Trustee, if Purchaser shall have reasonably determined that one (1) or more conditions set forth in Section 5.1 or 5.2 has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied);

(e)     by Trustee (provided that Seller or the Estate (as applicable) is not then in material breach of any representation, warranty, covenant or other agreement contained herein), by written notice to Purchaser, if the Trustee shall have reasonably determined that one (1) or more conditions set forth in Section 5.1 or 5.3 has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied);

(f)     by Purchaser, by written notice to Trustee, if Trustee does not file or (subsequent to filing) withdraws or seeks to withdraw the Sale Motion;

(g)     by Purchaser, by written notice to Trustee, if the Trustee (i) executes and delivers a written agreement or understanding of any kind with respect to an Alternative Transaction or (ii) seeks or supports Bankruptcy Court approval of an Alternative Transaction (other than to or by Purchaser);

(h)     by Purchaser, by written notice to Trustee, if the Bankruptcy Court enters an order approving any Alternative Transaction (other than to or by Purchaser);

(i)     by Purchaser, by written notice to Trustee, (i) if the Bankruptcy Court fails to enter the Sale Order by the Sale Order Deadline or (ii) on or after the date the Sale Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction, if applicable; or

(j)     by Purchaser or the Trustee, if the Closing shall not have been consummated prior the Closing Date Deadline; provided, however, that the Closing Date Deadline may be extended by the mutual written consent of Trustee and Purchaser; provided further, however, that a Party shall not be permitted to terminate this Agreement pursuant to this Section 6.1(j) if the failure of the Closing to occur prior to the Closing Date Deadline is as a result of the failure of the Party

seeking to terminate this Agreement to perform any of its obligations or covenants under this Agreement required to be performed by it at or prior to the Closing.

Each condition set forth in this <u>Section 6.1</u> pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition.  If more than one of the termination conditions set forth in this <u>Section 6.1</u> is applicable, the applicable Party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.  The Parties acknowledge and agree that no notice of termination provided pursuant to this <u>Section 6.1</u> shall become effective until two (2) business days after the delivery of such notice to the other Parties, and only if such notice shall not have been withdrawn during such two (2) business day period.

6.2     <u>Procedures Upon Termination; Effect of Termination</u>.

(a)     In the event of termination and abandonment by Purchaser or Trustee, or both Purchaser and Trustee, pursuant to <u>Section 6.1</u> hereof, written notice thereof shall forthwith be given to the other Party, and this Agreement shall terminate, and the purchase of the Property and the assumption of the Assumed Liabilities hereunder shall be abandoned, without further action by Purchaser, Seller, the Estate or the Trustee (each as applicable).  If this Agreement is terminated as provided herein, each Party shall return or destroy all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same.

(b)     In the event of termination of this Agreement pursuant to <u>Section 6.1</u>, this Agreement shall forthwith become null and void and there shall be no liability on the part of any Party or any of its partners, members, officers, directors, managers or shareholders; <u>provided</u>, <u>however</u>, that this <u>Section 6.2</u> and <u>ARTICLE IX</u> (Miscellaneous) shall survive any such termination.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.  Each Party acknowledges that the agreements contained in this <u>Section 6.2</u> are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that any amounts payable pursuant to this <u>Section 6.2</u> do not constitute a penalty.

ARTICLE VII
COMMISSIONS

7.1     <u>Broker or Finders</u>.  Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with the sale of the Property.   Each Party agrees that should any claim be made for brokerage commissions or finder's fees by any broker or finder by, through or on account of any acts of such Party or its representatives, such Party will hold the other Party free and harmless from and against any and all loss, liability, cost, damage and expense (including, attorneys' fees and court costs) in connection therewith.  The provisions of this <u>Section 7.1</u> shall survive Closing.

7.2     <u>Notice to Purchaser</u>.  **The Texas Real Estate License Act requires written notice to the Purchaser that the Purchaser should have an attorney examine an abstract of title to**

the real property being purchased or obtain a title insurance policy.  Notice to that effect is, therefore, hereby given to the Purchaser.

ARTICLE VIII
CONDEMNATION AND CASUALTY LOSS

8.1     <u>Condemnation</u>.  If, prior to the Closing Date, any material portion of the Property is taken by the exercise of the power of eminent domain or condemnation by any governmental entity or subdivision, the Trustee (on behalf of the Estate) shall give Purchaser written notice of such event, Purchaser shall have seven (7) days after receipt of such written notice from the Trustee in which to either (i) affirm this Agreement by written notice to Trustee, in which event the Estate shall (subject to Bankruptcy Court approval) assign to Purchaser all proceeds of any condemnation award at Closing, or (ii) terminate this Agreement and thereafter none of Purchaser, Seller, the Estate or the Trustee shall have any further rights or obligations hereunder except as otherwise expressly provided herein.

8.2     <u>Casualty Loss</u>.  Prior to the Closing, risk of loss with regard to the Property and the ownership, operation, management or maintenance thereof shall be borne by the Seller or the Estate (as applicable). If, following the Effective Date but prior to the Closing, all or substantially all the Property is damaged or destroyed by fire or other casualty (meaning the cost to repair is Two Hundred Thousand dollars ($200,000.00) or more) (a "<u>Casualty Loss</u>"), the Purchaser may, by written notice to the Trustee, given within thirty ten (10) days after the Purchaser's receiving written notice from the Trustee of such casualty, elect to terminate this Agreement pursuant to <u>ARTICLE VI</u>.  If the Purchaser does not elect to terminate this Agreement, or if the cost to repair the Property is less than Two Hundred Thousand dollars ($200,000.00), this Agreement shall remain in full force and effect, and the Parties shall proceed to Closing with no adjustments to the Purchase Price or otherwise, except that the Estate, with the reasonable approval of the Trustee, shall assign, transfer and set over to the Purchaser all the Seller's or the Estate's right, title and interest in and to insurance proceeds (if any) paid or to be paid with respect to such casualty.  **THE PURCHASER ACKNOWLEDGES THAT THE REAL PROPERTY HAS BEEN SIGNIFICANTLY DAMAGED BY PRIOR EXPLOSIONS AND FIRE, THE CHEMICAL PLANT AND FACILITIES LOCATED ON OR IN THE REAL PROPERTY ARE PARTIALLY CLOSED AND PARTIALLY INOPERABLE, AND THEREFORE, THE REAL PROPERTY IS BEING SOLD "AS IS". HOWEVER, IF, AFTER THE EFFECTIVE DATE, SELLER OR THE ESTATE SHOULD BECOME ENTITLED TO ANY ADDITIONAL INSURANCE CLAIM OR PROCEEDS BY REASON OF FURTHER DAMAGE AND DESTRUCTION TO THE REAL PROPERTY OCCURRING AFTER THE EFFECTIVE DATE, THEN, SOLELY TO THE EXTENT SUCH ADDITIONAL DAMAGE OR DESTRUCTION OCCURS AFTER THE EFFECTIVE DATE, SELLER OR THE ESTATE WILL, WITH THE REASONABLE APPROVAL OF THE TRUSTEE, ASSIGN ITS INTEREST IN SUCH CLAIM OR PROCEEDS TO PURCHASER AT CLOSING (IF THE CLOSING OCCURS).**

ARTICLE IX
MISCELLANEOUS

9.1     <u>Notices</u>.  Unless otherwise set forth herein, any notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party (a) when delivered to the appropriate address, if delivered  by hand or  nationally recognized overnight courier service (costs prepaid), or (b) when delivered by e-mail, if sent during the normal business hours of the recipient, upon confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided herein.  In the case of each of clauses (a) and (b),  deliveries shall be made to the following addresses or  e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, e-mail address or person as a Party may designate by notice to the other Party as provided herein):

(i)     If to the Seller:

KMCO, LLC
c/o ORG Chemical Midco, LLC
221 West Sixth Street, Suite 2000
Austin, Texas 78701
Attn: Jonathan D. Gormin and David Paschal
Telephone: (512) 505-4133
Email:  jgormin@orgroup.com and dpaschal@orgroup.com

With copies (which shall not constitute notice) to:

Miriam Goott, Esq. and Johnie Patterson, Esq.
Walker & Patterson, P.C.
4815 Dacoma
Houston, Texas  77092
Telephone:  713-956-5577
E-Mail:  mgoot@walkerandpatterson.com and
<u>jjp@walkerandpatterson.com</u>

<u>and</u>

Thomas Queen, Esq.
Queen  Saenz + Schutz PLLC
327 Congress Avenue, Suite 220
Austin, Texas 78701
Telephone:  512-472-1402 and 512-472-1407
E-Mail:   tqueen@qsps-law.com

(ii)     If to the Estate or the Trustee, to the address of record for the Trustee in the Bankruptcy Case; and

(iii)    If to the Purchaser:

        ALTIVIA Oxide Chemicals, LLC
        c/o ALTIVIA Investments, LLC
        1100 Louisiana, Suite 4800
        Houston, Texas 77002
        Attn.: J Michael Jusbasche, Chief Executive Officer
        E-Mail: M@ALTIVIA.com

    With copies (which shall not constitute notice) to:

        Edward W. Kerson, Esq.
        2 Fifth Avenue
        Apt. 12-K
        New York, New York 10011
        Telephone:  646-872-0681
        E-Mail:  ekerson@ewkny.com

        and

        Edward W. Kerson, Esq.
        50 S. 16th Street, Apt. 5005
        Philadelphia, Pennsylvania 19102
        Telephone:  646-872-0681
        E-Mail:  ekerson@ewkny.com

        and

        Harry A. Perrin, Esq.
        Vinson & Elkins LLP
        1001 Fannin Street, Suite 2500
        Houston, Texas  77002
        Telephone:  713-758-2548
        Email: hperrin@velaw.com

    9.2    Modification.  This Agreement cannot under any circumstance be modified orally, and no agreement shall be effective to waive, change, modify or discharge this Agreement in whole or in part unless such agreement is in writing and is signed by both Trustee and Purchaser.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy

hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

   9.3 <u>Time of Essence</u>.  Seller and Purchaser agree that time is of the essence with regard to this Agreement.

   9.4 <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon Purchaser and, subject to entry of the Sale Order and approval of the Trustee, Seller and the Estate, and inure to the benefit of the Parties and their respective successors and permitted assigns, including the Trustee.  Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any person or entity not a Party to this Agreement.  Except as contemplated herein, including in connection with any assignment of any rights or obligations hereunder to the Trustee in connection with the Bankruptcy Case (which assignment is expressly permitted), no assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other Party and any attempted assignment without such required consents shall be void; <u>provided</u> that nothing herein shall limit or restrict the right of Purchaser to assign any of its rights hereunder after the Closing or to an affiliate prior to the Closing (but no such assignment shall relieve Purchaser of its liabilities or obligations hereunder).

   9.5 <u>Exhibits and Schedules</u>.  The following exhibits, and any annexes, attachments and schedules attached hereto (hereinafter referred to collectively as the "<u>Exhibits</u>") shall be deemed to be an integral part of this Agreement:

   (a) <u>Exhibit A</u> – description of the Land

   (b) <u>Exhibit B</u> – form of Special Warranty Deed

   (c) <u>Exhibit C</u> – form of Bill of Sale and Assignment

   (d) <u>Exhibit D</u> – form of FIRPTA Affidavit

   (e) <u>Exhibit E</u> – Disclosure Schedules

   9.6 <u>Entire Agreement</u>.  This Agreement, including the Exhibits, contains the entire agreement between Seller and Purchaser pertaining to the transactions contemplated by this Agreement and fully supersedes all prior agreements and understandings between Seller and Purchaser pertaining to such transaction.

   9.7 <u>Further Assurances</u>.  Each Party shall execute and cause to be delivered to each other Party such instruments and other documents, and shall take such other actions, as such other Party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.  After the Closing, the Estate or Trustee, pursuant to the Sale Order, shall promptly transfer or deliver to Purchaser cash, checks (which shall be properly endorsed) or other property that it may receive in respect of any asset that constitutes part of the Property or relates to the Assumed Liabilities.  After the Closing, Purchaser shall promptly transfer or deliver to Trustee (for the benefit of the Estate) cash, checks (which shall

be properly endorsed) or other property that it may receive in respect of any asset that constitutes part of the Excluded Assets or relates to the liabilities other than Assumed Liabilities.

      9.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, and such executed counterparts shall constitute the same agreement.  It shall be necessary to account for only one such counterpart in proving the existence, validity or content of this Agreement.  The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

      9.9    <u>Severability</u>.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction and in lieu of such invalid, illegal or unenforceable provision or portion of any provision, there will be added automatically as a part of this Agreement a valid legal and enforceable provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible.

      9.10    <u>Choice of Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.  This Agreement shall be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the internal laws of the State of Texas shall govern, without regard to the conflicts of laws principles thereof (except for any laws of that state which would render such choice of laws ineffective), including all matters of construction, validity and performance.  ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE DOCUMENTS ENTERED INTO IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY ONLY BE INSTITUTED IN THE BANKRUPTCY COURT, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING.  SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT.  THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURT AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

9.11 <u>Joint Drafting</u>.  Seller and Purchaser hereby agree that this Agreement and the Exhibits have been jointly drafted, negotiated and agreed upon by Seller and Purchaser and that any rule of contract interpretation that provides that ambiguity will be construed against the drafting party is inapplicable to this Agreement and the Exhibits and shall not be used in connection with the interpretation of this Agreement or the Exhibits.

9.12 <u>Section Headings</u>.  Section headings contained herein, and the Table of Contents and Alphabetical List of Definitions, are for convenience only and shall not be considered in interpreting or construing this Agreement.

9.13 <u>Office of Foreign Assets Control (OFAC)</u> .  Pursuant to United States Presidential Executive Order 13224 ("<u>Executive Order</u>") and related regulations of the Office of Foreign Assets Control ("<u>OFAC</u>") of the U.S. Department of the Treasury, U.S. persons and entities are prohibited from transacting business with persons or entities who, from time to time are determined to have committed, or to pose a risk of committing or supporting, terrorist acts, narcotics trafficking, money laundering and related crimes.  Those persons and entities are identified on a list of Specially Designated Nationals and Blocked Persons (the "<u>List</u>"), published and regulated by OFAC. The names, including aliases, of these persons or entities ("<u>Blocked Persons</u>") are updated frequently.  In addition, OFAC enforces other Executive Orders which, from time to time, impose restrictions on transactions with, or involving certain countries.  Purchaser hereby certifies and represents that neither it, nor any of its owners, members of its governing body, management, employees or agents is on the List or is acting for, or on behalf any person or entity on the List.  Purchaser further acknowledges its obligation to remain in compliance with existing and future regulations promulgated by OFAC throughout the term of this Agreement.

9.14 <u>Survival of Representations and Warranties</u>.  The Parties agree that the representations and warranties contained in this Agreement and the Ancillary Documents shall expire upon the Closing Date.  The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

9.15 <u>Bulk Sales Laws</u>.  Each Party hereby waives compliance by the Parties with "bulk sales," "bulk transfers" or similar laws and all other similar laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement or any Ancillary Document.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement effective as of the date and year first written above.

PURCHASER:

ALTIVIA OXIDE CHEMICALS, LLC

By: _____

Name: J. Michael Jusbasche
Title:   Chief Executive Officer

SELLER:

KMCO, LLC

By: _____
Name: Jonathan D. Gormin
Title:   Manager

## Exhibit A

TRACT 1

BEING A 135.3067 ACRE (5,893,960 SQUARE FEET) TRACT OF LAND SITUATED IN THE B.F. TANKERSLEY SURVEY, A-770, HARRIS COUNTY, TEXAS, AND BEING ALL OF A CALLED 28.9185 ACRE TRACT AS DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. E526074, ALL OF A CALLED 47 ACRE TRACT RECORDED IN VOLUME 1975, PAGE 138 OF THE HARRIS COUNTY DEED RECORDS AND ALL OF A CALLED 17.5305 ACRE TRACT DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. E-526074 OF THE HARRIS COUNTY DEED RECORDS, AND ALL OF A CALLED 59.81 ACRES AS DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. S121754; SAID 135.3067 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED MY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 5/8 INCH IRON ROD FOUND IN THE SOUTH RIGHT-OF-WAY LINE OF CLARA WILSON ROAD (CALLED 60 FEET WIDE), ALSO BEING IN THE WEST RIGHT-OF-WAY LINE OF RAMSEY ROAD, VARYING WIDTH (CALLED 60 FEET WIDE), SAME BEING THE NORTHEAST CORNER OF SAID 28.9185 ACRE TRACT AND THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 03 DEGREES 01 MINUTE 13 SECONDS EAST, ALONG THE SAID WEST RIGHT-OF-WAY LINE OF RAMSEY ROAD, SAME BEING THE EAST LINE OF SAID 28.9185 ACRE TRACT, A DISTANCE OF 1354.04 FEET TO A FENCE CORNER IN THE NORTH RIGHT-OF-WAY LINE OF T & NO RR (100 FEET WIDE)  FOR THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 46 DEGREES 46 MINUTES 42 SECONDS WEST, ALONG THE SOUTH LINE OF SAID 28.9185 ACRE TRACT, SAID 47 ACRE TRACT AND SAID 59.81 ACRE TRACT, SAME BEING THE NORTH RIGHT-OF-WAY LINE OF SAID T & NO RR, A DISTANCE OF 3,341.04 FEET TO A 5/8 INCH IRON ROD SET FOR THE SOUTHWEST CORNER OF SAID 59.81 ACRE TRACT AND THE HEREIN DESCRIBED TRACT;

THENCE NORTH 02 DEGREES 51 MINUTES 44 SECONDS WEST, ALONG THE WEST LINE OF SAID 59.81 ACRE TRACT, A DISTANCE OF 3,492.68 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF THE SAID 59.81 ACRE TRACT AND HEREIN DESCRIBED TRACT;

THENCE NORTH 86 DEGREES 31 MINUTES 49 SECONDS EAST, ALONG THE NORTH LINE OF SAID 59.81 ACRE TRACT AND SAID 47 ACRE TRACT, SAME BEING THE SOUTH RIGHT-OF-WAY LINE OF SAID CLARA WILSON ROAD, A DISTANCE OF 1,428.72 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE SOUTH 03 DEGREES 13 MINUTES 25 SECONDS EAST, A DISTANCE OF 907.50 FEET TO A 5/8 INCH IRON ROD SET FOR AN INTERIOR CORNER;

THENCE NORTH 86 DEGREES 05 MINUTES 45 SECONDS EAST, A DISTANCE OF 299.66 FEET TO A 5/8 INCH IRON ROD SET IN THE EAST LINE OF SAID 47 ACRE TRACT, SAME BEING THE WEST LINE OF SAID 28.9185 ACRE TRACTS FOR AN INTERIOR CORNER;

THENCE NORTH 02 DEGREES 38 MINUTES 41 SECONDS WEST, ALONG THE SAID EAST LINE OF SAID 47 ACRE TRACT, SAME BEING THE WEST LINE OF SAID 28.9185 ACRE TRACT, A DISTANCE OF 907.50 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE COMMON NORTH CORNER OF SAID 47 AND 28.9185 ACRE TRACTS, SAME BEING IN THE SOUTH RIGHT-OF-WAY LINE OF SAID CLARA WILSON ROAD;

THENCE NORTH 86 DEGREES 49 MINUTES 45 SECONDS EAST, ALONG THE NORTH LINE OF SAID 28.9185 ACRE TRACT, SAME BEING THE SAID SOUTH RIGHT-OF-WAY LINE OF SAID CLARA WILSON ROAD, A DISTANCE OF 804.71 FEET TO THE POINT OF BEGINNING AND CONTAINING 135.3067 ACRES (5,893,960 SQUARE FEET) OF LAND, MORE OR LESS.

TRACT 2

BEING A 10.7261 ACRE (467,230 SQUARE FEET) TRACT OF LAND SITUATED IN THE TIPTON WALKER SURVEY, A-853, HARRIS COUNTY, TEXAS, AND BEING OUT OF A CALLED 23.5 ACRE TRACT DESCRIBED IN DEED TO IGNAC MICHALSKY RECORDED IN VOLUME 674, PAGE 586 OF THE DEED RECORDS OF HARRIS COUNTY, TEXAS; SAID 10.7261 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 3/4 INCH IRON ROD FOUND IN THE NORTH RIGHT-OF-WAY LINE OF T & NO RR (100 FEET WIDE) AND THE EAST RIGHT-OF-WAY LINE OF RAMSEY ROAD VARYING WIDTH (CALLED 60 FEET WIDE);

THENCE NORTH 02 DEGREES 29 MINUTES 08 SECONDS WEST, ALONG THE EAST RIGHT-OF-WAY LINE OF SAID RAMSEY ROAD, A DISTANCE OF 889.83 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 86 DEGREES 43 MINUTES 06 SECONDS EAST, A DISTANCE OF 1050.26 FEET TO A 1 INCH IRON PIPE FOUND IN THE NORTH RIGHT-OF-WAY LINE OF SAID T & NO RR FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 46 DEGREES 46 MINUTES 42 SECONDS WEST, ALONG THE NORTH RIGHT-OF-WAY LINE OF SAID T & NO RR RIGHT-OF-WAY, A DISTANCE OF 1385.93 FEET TO THE POINT OF BEGINNING AND CONTAINING 10.7261 ACRES (467,230 SQUARE FEET) OF LAND, MORE OR LESS.

TRACT 3

BEING A 1.1503 ACRE (50,108 SQUARE FEET) TRACT OF LAND SITUATED IN THE B. F. TANKERSLEY SURVEY, A-770, HARRIS COUNTY, TEXAS, AND BEING OUT OF A CALLED 6.17 ACRE TRACT OUT OF THE LARS NELSON ESTATE SUBDIVISION, RECORDED IN VOLUME 243, PAGE 417 OF THE DEED RECORDS OF HARRIS COUNTY, TEXAS; SAID 1.1503 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 5/8 INCH IRON ROD SET IN THE SOUTH RIGHT-OF-WAY LINE OF CROSBY–DAYTON ROAD (100 FEET WIDE) AND BEING IN THE WEST RIGHT-OF-WAY LINE OF RAMSEY ROAD, VARYING WIDTH (CALLED 60 FEET WIDE);

THENCE SOUTH 01 DEGREE 53 MINUTES 42 SECONDS EAST, ALONG THE WEST RIGHT-OF-WAY LINE OF SAID RAMSEY ROAD, A DISTANCE OF 294.83 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 87 DEGREES 15 MINUTES 27 SECONDS WEST, A DISTANCE OF 302.47 FEET TO A ¾ INCH IRON PIPE FOUND FOR THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 01 DEGREES 43 MINUTES 23 SECONDS WEST, A DISTANCE OF 36.64 FEET TO A 5/8 INCH IRON ROD SET IN THE SOUTH RIGHT-OF-WAY LINE OF SAID CROSBY–DAYTON ROAD FOR THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 47 DEGREES 07 MINUTES 11 SECONDS EAST, A DISTANCE OF 400.50 FEET ALONG THE SOUTH RIGHT-OF-WAY LINE OF SAID CROSBY–DAYTON ROAD TO THE POINT OF BEGINNING AND CONTAINING 1.1503 ACRES (50,108 SQUARE FEET) OF LAND, MORE OR LESS.

4

TRACT 4

BEING A 13.9529 ACRES (607,790 SQUARE FEET) TRACT OF LAND SITUATED IN THE B.F. TANKERSLEY SURVEY, A-770, HARRIS COUNTY, TEXAS, AND BEING OUT OF A CALLED 19.66 ACRE TRACT AS DESCRIBED IN DEED RECORDED IN VOLUME 8275, PAGE 388 OF THE HARRIS COUNTY DEED RECORDS; SAID 13.9529 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED MY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 5/8 INCH IRON ROD SET IN THE SOUTH RIGHT-OF-WAY LINE OF CROSBY–DAYTON ROAD (100 FEET WIDE), BEING IN THE WEST LINE OF LOT 2 OF THE DIVISION OF THE SAID TANKERSLEY SURVEY, BEING THE NORTHWEST CORNER OF SAID 19.66 ACRE TRACT AND BEING THE NORTHEAST CORNER OF A CALLED 6.00 ACRE TRACT TO RANDOLF RUCKA AS DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. S876401 OF THE HARRIS COUNTY DEED RECORDS AND BEING THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 46 DEGREES 43 MINUTES 46 SECONDS EAST, ALONG THE SOUTH RIGHT-OF-WAY LINE OF SAID CROSBY–DAYTON ROAD, A DISTANCE OF 235.94 FEET TO A 5/8 INCH IRON ROD SET FOR THE MOST NORTHERLY NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 02 DEGREES 53 MINUTES 30 SECONDS EAST, A DISTANCE OF 486.17 FEET TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHWEST CORNER OF A CALLED 7.091 ACRE TRACT DESCRIBED IN FILM CODE NO. 20110012053 OF THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS, FOR AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 87 DEGREES 20 MINUTES 29 SECONDS EAST, ALONG THE SOUTH LINE OF SAID 7.091 ACRE TRACT, A DISTANCE OF 681.11 FEET TO A FENCE POST FOUND IN THE EAST LINE OF SAID 19.66 ACRE TRACT, THE WEST LINE OF THE EAST CANAL RIGHT-OF-WAY FOR THE MOST EASTERLY NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 02 DEGREES 25 MINUTES 41 SECONDS EAST, ALONG THE WEST LINE OF SAID CANAL, SAME BEING THE EAST LINE OF SAID 19.66 ACRE TRACT, A DISTANCE OF 575.14 FEET TO A 5/8 INCH IRON ROD SET IN THE NORTH LINE OF A 0.0033 ACRE TRACT DESCRIBED AS TRACT 9 RECORDED UNDER CLERKS FILM CODE NO. 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 OF THE HARRIS COUNTY DEED RECORDS FOR THE MOST EASTERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 44 DEGREES 39 MINUTES 39 SECONDS WEST, ALONG THE WEST LINE OF SAID 0.0033 ACRE TRACT, A DISTANCE OF 70.53 FEET TO A 5/8 INCH IRON ROD FOUND IN THE SOUTH LINE OF SAID 19.66 ACRE TRACT, SAME BEING THE SOUTH LINE OF B.F. TANKERSLEY SURVEY, SAME BEING THE NORTH LINE OF THE J. QUINLAN SURVEY, ABSTRACT NO-641 FOR THE MOST SOUTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 87 DEGREES 10 MINUTES 13 SECONDS WEST, ALONG THE SOUTH LINE OF SAID 19.66 ACRE TRACT, SOUTH LINE OF B.F. TANKERSLEY SURVEY, NORTH LINE OF J. QUINLAN SURVEY, A DISTANCE OF 803.70 FEET TO A 3/4 INCH IRON PIPE FOUND, BEING THE SOUTHEAST CORNER OF SAID 6.00 ACRE TRACT AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 02 DEGREES 55 MINUTES 06 SECONDS WEST, ALONG THE WEST LINE OF SAID 19.66 ACRE TRACT, SAME BEING THE EAST LINE OF SAID 6.00 ACRE TRACT, A DISTANCE OF 957.94 FEET TO THE POINT OF BEGINNING AND CONTAINING 13.9529 ACRES (607,790 SQUARE FEET) OF LAND, MORE OR LESS.

## Exhibit B

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## SPECIAL WARRANTY DEED

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF HARRIS | § | |

THAT KMCO, LLC, a Delaware limited liability company ("**Grantor**"), for and in consideration of TEN DOLLARS ($10.00) and other good and valuable consideration paid to Grantor by ALTIVIA Oxide Chemicals, LLC, a Delaware limited liability company ("**Grantee**"), whose address for notice is 1100 Louisiana, Suite 4800, Houston, Texas 77002, the receipt and sufficiency of which considerations are hereby acknowledged and confessed, has **GRANTED, BARGAINED, SOLD** and **CONVEYED**, and by these presents does **GRANT, BARGAIN, SELL** and **CONVEY** to Grantee those certain tracts or parcels of land located in Harris County, Texas, more particularly described in **Exhibit "A"** attached hereto and made part hereof for all purposes (the "**Land**") together with all buildings, structures, fixtures, and other improvements located thereon (the "**Improvements**"). The Land and the Improvements are hereinafter collectively referred to as the "**Property**".

This conveyance is made and accepted subject to the following matters: (i) real estate ad valorem taxes and assessments attributable to the Property for the year 2019 or 2020 and subsequent years (as well as subsequent taxes for prior years due to changes in land usage or ownership), (ii) any and all agreements, restrictions, covenants, conditions, exceptions, reservations, easements, rights-of-way, conflicts, encroachments, area and boundary discrepancies, encumbrances and any other matters shown by the Official Records of the County Clerk of Harris County, Texas, but only to the extent the same are validly subsisting and in effect and affect or relate to the Property, or that would be disclosed by an accurate survey or inspection of the Property, and (iii) all zoning laws, regulations, and ordinances of municipal and/or other governmental agencies and authorities relating to the Property (collectively, the "**Permitted Encumbrances**"), *provided, however*, in no event shall Permitted Encumbrances include, and the conveyance of the Property shall not be subject to (a) any prior conveyances or purported conveyances of fee title to all or any portion of the Property by Grantor, or (b) any lien, pledge, mortgage, deed of trust, security interest, mechanics' or materialmen's liens, or any other monetary lien of any kind or character (other than as set forth in item (i) above).

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereunto in anywise belonging, unto Grantee, its successors and assigns forever, subject to Permitted Encumbrances, and Grantor does hereby bind itself, its successors and assigns, to **WARRANT AND FOREVER DEFEND** all and singular the title to the Property

unto the said Grantee, its successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject in all instances to the Permitted Encumbrances.

For the same consideration recited above, Grantor hereby **BARGAINS, SELLS and TRANSFERS**, without warranty of title, express or implied, and subject to the Permitted Encumbrances, all of Grantor's rights, titles and interests (if any) in and to all land in the bed of any street, road, rail or avenue, open or proposed, public or private, in front of, or adjoining the Land; all rights of way or rights of ingress or egress on, or to any land, street, road or avenue, open or proposed, in, on, across, in front of, abutting or adjoining the Land; riparian and other water access rights, drainage rights and sewer rights belonging to the Land; all governmental permits and approvals, and all other intangible assets relating to the Land and all easements which serve the Land, some of which may be non-exclusive easements (collectively, the "**Appurtenances**"). **THE TRANSFER OF THE AFOREMENTIONED APPURTENANCES IS MADE WITHOUT ANY WARRANTY OF TITLE, EXPRESS OR IMPLIED. ALL WARRANTIES THAT MAY ARISE BY COMMON LAW, STATUTE, OR OTHERWISE, INCLUDING WITHOUT LIMITATION, THE WARRANTIES IN SECTION 5.023 OF THE TEXAS PROPERTY CODE (OR ITS SUCCESSOR) ARE HEREBY EXPRESSLY EXCLUDED WITH RESPECT TO SUCH AFOREMENTIONED APPURTENANCES.**

[Signature Page Follows]

IN WITNESS WHEREOF, Grantor has executed this Special Warranty Deed this [DAY] day of [MONTH], 2020

KMCO, LLC

By: _____
Name:
Title:

THE STATE OF TEXAS          §
                            §
COUNTY OF _____           §

This instrument was acknowledged before me on the _____ day of _____, 2020, by [NAME], [TITLE] of KMCO, LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
NOTARY PUBLIC, State of Texas

(Seal)

My commission expires on [DATE].

## EXHIBIT A

## Real Property

TRACT 1

BEING A 135.3067 ACRE (5,893,960 SQUARE FEET) TRACT OF LAND SITUATED IN THE B.F. TANKERSLEY SURVEY, A-770, HARRIS COUNTY, TEXAS, AND BEING ALL OF A CALLED 28.9185 ACRE TRACT AS DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. E526074, ALL OF A CALLED 47 ACRE TRACT RECORDED IN VOLUME 1975, PAGE 138 OF THE HARRIS COUNTY DEED RECORDS AND ALL OF A CALLED 17.5305 ACRE TRACT DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. E-526074 OF THE HARRIS COUNTY DEED RECORDS, AND ALL OF A CALLED 59.81 ACRES AS DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. S121754; SAID 135.3067 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED MY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 5/8 INCH IRON ROD FOUND IN THE SOUTH RIGHT-OF-WAY LINE OF CLARA WILSON ROAD (CALLED 60 FEET WIDE), ALSO BEING IN THE WEST RIGHT-OF-WAY LINE OF RAMSEY ROAD, VARYING WIDTH (CALLED 60 FEET WIDE), SAME BEING THE NORTHEAST CORNER OF SAID 28.9185 ACRE TRACT AND THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 03 DEGREES 01 MINUTE 13 SECONDS EAST, ALONG THE SAID WEST RIGHT-OF-WAY LINE OF RAMSEY ROAD, SAME BEING THE EAST LINE OF SAID 28.9185 ACRE TRACT, A DISTANCE OF 1354.04 FEET TO A FENCE CORNER IN THE NORTH RIGHT-OF-WAY LINE OF T & NO RR (100 FEET WIDE)  FOR THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 46 DEGREES 46 MINUTES 42 SECONDS WEST, ALONG THE SOUTH LINE OF SAID 28.9185 ACRE TRACT, SAID 47 ACRE TRACT AND SAID 59.81 ACRE TRACT, SAME BEING THE NORTH RIGHT-OF-WAY LINE OF SAID T & NO RR, A DISTANCE OF 3,341.04 FEET TO A 5/8 INCH IRON ROD SET FOR THE SOUTHWEST CORNER OF SAID 59.81 ACRE TRACT AND THE HEREIN DESCRIBED TRACT;

THENCE NORTH 02 DEGREES 51 MINUTES 44 SECONDS WEST, ALONG THE WEST LINE OF SAID 59.81 ACRE TRACT, A DISTANCE OF 3,492.68 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF THE SAID 59.81 ACRE TRACT AND HEREIN DESCRIBED TRACT;

THENCE NORTH 86 DEGREES 31 MINUTES 49 SECONDS EAST, ALONG THE NORTH LINE OF SAID 59.81 ACRE TRACT AND SAID 47 ACRE TRACT, SAME BEING THE SOUTH RIGHT-OF-WAY LINE OF SAID CLARA WILSON ROAD, A DISTANCE OF 1,428.72 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE SOUTH 03 DEGREES 13 MINUTES 25 SECONDS EAST, A DISTANCE OF 907.50 FEET TO A 5/8 INCH IRON ROD SET FOR AN INTERIOR CORNER;

THENCE NORTH 86 DEGREES 05 MINUTES 45 SECONDS EAST, A DISTANCE OF 299.66 FEET TO A 5/8 INCH IRON ROD SET IN THE EAST LINE OF SAID 47 ACRE TRACT, SAME BEING THE WEST LINE OF SAID 28.9185 ACRE TRACTS FOR AN INTERIOR CORNER;

THENCE NORTH 02 DEGREES 38 MINUTES 41 SECONDS WEST, ALONG THE SAID EAST LINE OF SAID 47 ACRE TRACT, SAME BEING THE WEST LINE OF SAID 28.9185 ACRE TRACT, A DISTANCE OF 907.50 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE COMMON NORTH CORNER OF SAID 47 AND 28.9185 ACRE TRACTS, SAME BEING IN THE SOUTH RIGHT-OF-WAY LINE OF SAID CLARA WILSON ROAD;

THENCE NORTH 86 DEGREES 49 MINUTES 45 SECONDS EAST, ALONG THE NORTH LINE OF SAID 28.9185 ACRE TRACT, SAME BEING THE SAID SOUTH RIGHT-OF-WAY LINE OF SAID CLARA WILSON ROAD, A DISTANCE OF 804.71 FEET TO THE POINT OF BEGINNING AND CONTAINING 135.3067 ACRES (5,893,960 SQUARE FEET) OF LAND, MORE OR LESS.

TRACT 2

BEING A 10.7261 ACRE (467,230 SQUARE FEET) TRACT OF LAND SITUATED IN THE TIPTON WALKER SURVEY, A-853, HARRIS COUNTY, TEXAS, AND BEING OUT OF A CALLED 23.5 ACRE TRACT DESCRIBED IN DEED TO IGNAC MICHALSKY RECORDED IN VOLUME 674, PAGE 586 OF THE DEED RECORDS OF HARRIS COUNTY, TEXAS; SAID 10.7261 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 3/4 INCH IRON ROD FOUND IN THE NORTH RIGHT-OF-WAY LINE OF T & NO RR (100 FEET WIDE) AND THE EAST RIGHT-OF-WAY LINE OF RAMSEY ROAD VARYING WIDTH (CALLED 60 FEET WIDE);

THENCE NORTH 02 DEGREES 29 MINUTES 08 SECONDS WEST, ALONG THE EAST RIGHT-OF-WAY LINE OF SAID RAMSEY ROAD, A DISTANCE OF 889.83 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 86 DEGREES 43 MINUTES 06 SECONDS EAST, A DISTANCE OF 1050.26 FEET TO A 1 INCH IRON PIPE FOUND IN THE NORTH RIGHT-OF-WAY LINE OF SAID T & NO RR FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 46 DEGREES 46 MINUTES 42 SECONDS WEST, ALONG THE NORTH RIGHT-OF-WAY LINE OF SAID T & NO RR RIGHT-OF-WAY, A DISTANCE OF 1385.93 FEET TO THE POINT OF BEGINNING AND CONTAINING 10.7261 ACRES (467,230 SQUARE FEET) OF LAND, MORE OR LESS.

TRACT 3

BEING A 1.1503 ACRE (50,108 SQUARE FEET) TRACT OF LAND SITUATED IN THE B. F. TANKERSLEY SURVEY, A-770, HARRIS COUNTY, TEXAS, AND BEING OUT OF A CALLED 6.17 ACRE TRACT OUT OF THE LARS NELSON ESTATE SUBDIVISION, RECORDED IN VOLUME 243, PAGE 417 OF THE DEED RECORDS OF HARRIS COUNTY, TEXAS; SAID 1.1503 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 5/8 INCH IRON ROD SET IN THE SOUTH RIGHT-OF-WAY LINE OF CROSBY–DAYTON ROAD (100 FEET WIDE) AND BEING IN THE WEST RIGHT-OF-WAY LINE OF RAMSEY ROAD, VARYING WIDTH (CALLED 60 FEET WIDE);

THENCE SOUTH 01 DEGREE 53 MINUTES 42 SECONDS EAST, ALONG THE WEST RIGHT-OF-WAY LINE OF SAID RAMSEY ROAD, A DISTANCE OF 294.83 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 87 DEGREES 15 MINUTES 27 SECONDS WEST, A DISTANCE OF 302.47 FEET TO A ¾ INCH IRON PIPE FOUND FOR THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 01 DEGREES 43 MINUTES 23 SECONDS WEST, A DISTANCE OF 36.64 FEET TO A 5/8 INCH IRON ROD SET IN THE SOUTH RIGHT-OF-WAY LINE OF SAID CROSBY–DAYTON ROAD FOR THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 47 DEGREES 07 MINUTES 11 SECONDS EAST, A DISTANCE OF 400.50 FEET ALONG THE SOUTH RIGHT-OF-WAY LINE OF SAID CROSBY–DAYTON ROAD TO THE POINT OF BEGINNING AND CONTAINING 1.1503 ACRES (50,108 SQUARE FEET) OF LAND, MORE OR LESS.

TRACT 4

BEING A 13.9529 ACRES (607,790 SQUARE FEET) TRACT OF LAND SITUATED IN THE B.F. TANKERSLEY SURVEY, A-770, HARRIS COUNTY, TEXAS, AND BEING OUT OF A CALLED 19.66 ACRE TRACT AS DESCRIBED IN DEED RECORDED IN VOLUME 8275, PAGE 388 OF THE HARRIS COUNTY DEED RECORDS; SAID 13.9529 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED MY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 5/8 INCH IRON ROD SET IN THE SOUTH RIGHT-OF-WAY LINE OF CROSBY–DAYTON ROAD (100 FEET WIDE), BEING IN THE WEST LINE OF LOT 2 OF THE DIVISION OF THE SAID TANKERSLEY SURVEY, BEING THE NORTHWEST CORNER OF SAID 19.66 ACRE TRACT AND BEING THE NORTHEAST CORNER OF A CALLED 6.00 ACRE TRACT TO RANDOLF RUCKA AS DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. S876401 OF THE HARRIS COUNTY DEED RECORDS AND BEING THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 46 DEGREES 43 MINUTES 46 SECONDS EAST, ALONG THE SOUTH RIGHT-OF-WAY LINE OF SAID CROSBY–DAYTON ROAD, A DISTANCE OF 235.94 FEET TO A 5/8 INCH IRON ROD SET FOR THE MOST NORTHERLY NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 02 DEGREES 53 MINUTES 30 SECONDS EAST, A DISTANCE OF 486.17 FEET TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHWEST CORNER OF A CALLED 7.091 ACRE TRACT DESCRIBED IN FILM CODE NO. 20110012053 OF THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS, FOR AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 87 DEGREES 20 MINUTES 29 SECONDS EAST, ALONG THE SOUTH LINE OF SAID 7.091 ACRE TRACT, A DISTANCE OF 681.11 FEET TO A FENCE POST FOUND IN THE EAST LINE OF SAID 19.66 ACRE TRACT, THE WEST LINE OF THE EAST CANAL RIGHT-OF-WAY FOR THE MOST EASTERLY NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 02 DEGREES 25 MINUTES 41 SECONDS EAST, ALONG THE WEST LINE OF SAID CANAL, SAME BEING THE EAST LINE OF SAID 19.66 ACRE TRACT, A DISTANCE OF 575.14 FEET TO A 5/8 INCH IRON ROD SET IN THE NORTH LINE OF A 0.0033 ACRE TRACT DESCRIBED AS TRACT 9 RECORDED UNDER CLERKS FILM CODE NO. 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 OF THE HARRIS COUNTY DEED RECORDS FOR THE MOST EASTERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 44 DEGREES 39 MINUTES 39 SECONDS WEST, ALONG THE WEST LINE OF SAID 0.0033 ACRE TRACT, A DISTANCE OF 70.53 FEET TO A 5/8 INCH IRON ROD FOUND IN THE SOUTH LINE OF SAID 19.66 ACRE TRACT, SAME BEING THE SOUTH LINE OF B.F. TANKERSLEY SURVEY, SAME BEING THE NORTH LINE OF THE J. QUINLAN SURVEY, ABSTRACT NO-641 FOR THE MOST SOUTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 87 DEGREES 10 MINUTES 13 SECONDS WEST, ALONG THE SOUTH LINE OF SAID 19.66 ACRE TRACT, SOUTH LINE OF B.F. TANKERSLEY SURVEY, NORTH LINE OF J. QUINLAN SURVEY, A DISTANCE OF 803.70 FEET TO A 3/4 INCH IRON PIPE FOUND, BEING THE SOUTHEAST CORNER OF SAID 6.00 ACRE TRACT AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 02 DEGREES 55 MINUTES 06 SECONDS WEST, ALONG THE WEST LINE OF SAID 19.66 ACRE TRACT, SAME BEING THE EAST LINE OF SAID 6.00 ACRE TRACT, A DISTANCE OF 957.94 FEET TO THE POINT OF BEGINNING AND CONTAINING 13.9529 ACRES (607,790 SQUARE FEET) OF LAND, MORE OR LESS.

## Exhibit C

**BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AGREEMENT (this "Agreement") is entered into and made effective as of [•], 2020, by and between KMCO, LLC, a Delaware limited liability company ("Seller"), and ALTIVIA Oxide Chemicals, LLC, a Delaware limited liability company ("Purchaser").

### WITNESSETH:

WHEREAS, Purchaser and Seller are parties to that certain Agreement of Sale and Purchase dated May 8, 2020 (the "Purchase Agreement"), whereby, among other things, Seller has agreed to sell, transfer, contribute and assign to Purchaser the Other Assets and to assign to Purchaser the Assumed Liabilities, and Purchaser has agreed to accept and assume the Assumed Liabilities, in each case as further set forth in the Purchase Agreement.

NOW THEREFORE, in consideration of the premises and the agreements and covenants set forth herein and in the Purchase Agreement and such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### AGREEMENT:

1. All capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

2. Seller hereby sells, transfers, conveys, assigns and delivers to Purchaser the Other Assets and the Assumed Liabilities, on the terms and conditions and subject to the exceptions and qualifications set forth in the Purchase Agreement.

3. Purchaser hereby accepts and assumes the assignment of the Assumed Liabilities and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities of Seller from and after the Closing in connection with the Assumed Liabilities.

4. All of the covenants, terms and conditions set forth herein shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

5. This Agreement and the Purchase Agreement constitute the entire agreement between the parties hereto with respect to the subject matter herein and supersede any prior understandings, agreements or representations by or between the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

6. Each of the parties hereto acknowledges and agrees that the representations, warranties, covenants and agreements contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided in the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall control. The resolution of any controversy or claim arising out of or relating to this Agreement and the

provision of notice shall be governed and conducted pursuant to the terms of the Purchase Agreement.

       7.      Each of the parties hereto covenants and agrees to execute and deliver, at the reasonable request of the other party hereto, such further instruments of transfer and assignment and to take such other action as such other party may reasonably request to consummate the assignments and assumptions contemplated by this Agreement.

       8.      No party may assign any of its rights under this Agreement without the prior consent of the other party.  Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties.  Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

       9.      This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the date and year first above written.

**Purchaser**:

**ALTIVIA Oxide Chemicals, LLC**

By:_____
Name: J. Michael Jusbasche
Title: Chief Executive Officer

**Seller**:

**KMCO, LLC**

By:_____
Name: Johnathan D. Gormin
Title:  Manager

**Exhibit D**

**CERTIFICATION OF NON-FOREIGN STATUS**

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform ALTIVIA Oxide Chemicals, LLC, a Delaware limited liability company ("Transferee"), that withholding of tax is not required upon the disposition of a U.S. real property interest by KMCO, LLC, a Delaware limited liability company ("Seller"), the undersigned hereby certifies the following on behalf of ORG Chemical Holdings, LLC, a Delaware limited liability company ("Transferor"):

1.  Seller is disregarded as an entity separate from Transferor pursuant to Treasury regulation § 301.7701-3;

2.  Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and the Treasury Regulations);

3.  Transferor is not a disregarded entity as defined in Treasury regulation § 1.1445-2(b)(2)(iii);

4.  Transferor's U.S. employer identification number is 90-0803647; and

5.  Transferor's office address is 16503 Ramsey Road, Crosby, Texas 77532.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

Date: [_____] [__], 2020

ORG Chemical Holdings, LLC

By: _____
Name: Johnathan D. Gormin
Title:  Manager

**<u>Exhibit E</u>**

**DISCLOSURE SCHEDULES**

May 8, 2020

These Disclosure Schedules are being furnished in connection with, and are a part of, that certain Agreement of Sale and Purchase of even date herewith (the "<u>Agreement</u>"), by and between KMCO, LLC**,** a Delaware limited liability company ("<u>Seller</u>"), and ALTIVIA Oxide Chemicals, LLC, a Delaware limited liability company ("<u>Purchaser</u>").  Unless the context otherwise requires, all capitalized terms used in these Disclosure Schedules shall have the respective meanings assigned to them in the Agreement.

The schedule numbers in these Disclosure Schedules correspond to the schedule references and/or section numbers in the Agreement, and these Disclosure Schedules identify exceptions by specific section references; <u>provided</u>, <u>however</u>, that any information disclosed in one schedule (including any attachments to these Disclosure Schedules) shall be deemed to be disclosed in every section to which its relevance is reasonably apparent from the face of such disclosure, whether or not repeated or cross-referenced under any schedule number where such disclosure might be deemed appropriate.

These Disclosure Schedules are not intended to constitute, and the inclusion in these Disclosure Schedules of any matter or documentation shall not constitute, and shall not be construed as constituting, any representation, warranty or undertaking not expressly given in the Agreement, nor shall any such disclosure be taken as extending the scope of any of the representations contained in the Agreement.  The inclusion of any item in these Disclosure Schedules shall not be deemed to be an admission by Seller or evidence of the materiality of such item or an admission by Seller or evidence that such item is material to the business, operations, assets, liabilities, financial condition or results of operations of Seller, nor shall it establish a standard of materiality for any purpose whatsoever, nor shall it be deemed an admission of any liability to any third party, nor an admission against Seller or the interests of Seller.

**Schedule 1.1**

**Other Assets**

Schedule 1.1(i) – Tangible Personal Property

See Schedule 1.1(i) attached hereto as a separate document. Certain of the assets listed on Schedule 1.1(i) were damaged or destroyed in the Crosby Incident (as defined below).

Schedule 1.1(iii) – Approvals and Consents

None.

Schedule 1.1(v) – Motor Vehicles

| Description | VIN # |
|---|---|
| Boiler Trailer | IN9A22X32J1012401 |
| 2 seat Kubota | A5KB1FDAHBG0C0495 |
| 4 Seat Kubota | A5KD1HDAAFG034185 |
| Northern Tool Pressure Waster | 4K1PT4C12JK006620 |
| Back Hoe | JKGN580SEAC533557 |
| Heil Bulk Liquid Trailer | H-37445 |
| 53' Box Trailer | 1GRAA06244T509559 |
| Yard Mule | 318437 |
| Locomotive | Unit Number - 1508 |
| Pressure Washer (Tank unit) | 1D9D1CB20E1745 |
| 16 ft utility trailer | VIN#5VNBU1620CT106439 |
| Hand-made trailer | No VIN # |

**Schedule 1.4(a)**

**<u>Assumed Liabilities</u>**

1. All liabilities of Seller for property taxes for 2019 (estimated at approximately $623,000 and all fees, penalties and expenses incurred through the date of payment) and 2020.

2. With respect to the Inventory located at the Real Property and no longer held for use by Seller in the operation of the Business, all liabilities of Seller to remove such Inventory from the Real Property (i.e., to de-inventory the Crosby facility) and dispose of such Inventory (including all hazardous materials contained therein) in a manner that is compliant with all applicable laws and regulations.

3. All environmental liabilities that run with the conveyance of the Real Property by operation of law.

**Schedule 3.5**

**Allocation of Purchase Price**

The Purchase Price will be allocated among land, plant and equipment and rolling stock in the following percentages; provided, however, that for purposes of such allocation and tax matters, the Purchase Price shall exclude future performance obligations that are not fixed in amount as of the Closing Date and any contingent liabilities:

| Items Acquired | % of Total |
| --- | --- |
| Land - 161.1360 Ac. | 13.04% |
| Plant & equipment | 86.68% |
| Rolling Stock | 0.29% |

**Schedule 4.1(b)**

**<u>Authorization of Agreement</u>**

The disclosures set forth in Schedule 4.1(c)(i) are incorporated herein by reference.

**Schedule 4.1(c)**

**Conflicts; Consents; Compliance with Law**

Schedule 4.1(c)(i):

In connection with the execution, delivery and performance by Seller of the Agreement and the Ancillary Documents to which it is a party, the compliance by Seller with the provisions thereof, the consummation of the transactions contemplated thereby, and the taking by Seller of other actions contemplated thereby: (i) the prior written consent of BSP Agency, LLC is required pursuant to that certain Credit Agreement dated June 30, 2017 by and among Seller, ORG Chemical Midco, LLC, a Delaware limited liability company, ORG Chemical Holdings, LLC, BSP Agency, LLC and certain other parties named therein, as amended from time to time (the "BSP Credit Agreement"); and (ii) the prior written consent of Cadence Bank, N.A. is required pursuant to that certain Credit Agreement dated June 30, 2017 (as amended) by and among the Seller, ORG Chemical Midco, LLC, a Delaware limited liability company, ORG Chemical Holdings, LLC, Cadence Bank, N.A. and certain other parties named therein, as amended from time to time (the "Cadence Credit Agreement").

Schedule 4.1(c)(ii):

In connection with the April 2, 2019 explosion at and subsequent shutdown (the "Crosby Incident") of the Seller's manufacturing facility and related real estate located at 16503 Ramsey Rd., Crosby, Texas 77532 (the "Crosby Facility"), and other allegations not related to the Crosby Incident, Seller is subject to various litigation and regulatory enforcement actions (alleging various violations of laws), as set forth below (collectively, the "Actions"):

1. *Campos vs. KMCO, LLC* (Cause No. 2019-24813, pending in the 189th District Court of Harris County, Texas)

2. *De Lage Landen Financial Services, Inc. vs. KMCO d/b/a Texas KMCO, LLC* (Cause No. 2019-11743-CT, pending in the Chester County Court of Common Pleas, Pennsylvania)

3. *Edwards vs. KMCO, LLC* (Cause No. 2019-67063, pending in the 61st District Court of Harris County, Texas)

4. *Eugene Scalia, Secretary of Labor, United States Department of Labor vs. KMCO, LLC* (OSHA Docket No. 19-1681, pending before the Occupational Safety & Health Review Commission)

5. *Harris County, Texas v. KMCO, LLC* (Cause No. 2019-78741, pending in the 129th Judicial District of Harris County, Texas)

6. *Harris County Texas vs. KMCO, LLC* (Cause No. 2019-33228, pending in the 152nd District Court of Harris County, Texas)

7. *In the Matter of an Enforcement Action Against KMCO, LLC*; RN 101613511 (TCEQ Docket No. 2018-0804-IHW-E, before the Texas Commission on Environmental Quality)

8. *Inner-Plant Product Storage Co., LLC v. KMCO, LLC* (Cause No. 2020-22970, pending in the 133rd Judicial District of Harris County, Texas)

9. *Martinez vs. KMCO, LLC* (Cause No. 2019-24116, pending in the 234th District Court of Harris County, Texas)

10. *Martinez vs. KMCO, LLC* (Cause No. 2019-57603, pending in the 165th District Court of Harris County, Texas)

11. *Mesa Mechanical Inc. vs. KMCO, LLC* (Cause No. 2019-78298, pending in the 125th District Court of Harris County, Texas)

12. *Pender-Bellard vs. KMCO, LLC* (Cause No. 2019-86328, pending in the 61st District Court of Harris County, Texas)

13. *Plata vs. KMCO, LLC* (Cause No. 2019-25495, pending in the 334th District Court of Harris County, Texas)

14. *Preferred Industrial Contractors, Inc. v. KMCO, LLC* (Cause No. 2020-18954, pending in the 157th Judicial District of Harris County, Texas)

15. *Robinson vs. KMCO, LLC* (Cause No. 2019-35495, pending in the 157th District Court of Harris County, Texas)

16. *State of Texas vs. KMCO, LLC* (Cause No. D-1-GN-19-001795, pending in the 126th District Court of Travis County, Texas)

17. *US Fire Pump Company vs. KMCO, LLC* (Cause No. 4:19-cv-02857, pending in the United States District Court for the Southern District of Texas)

18. *Villagran vs. KMCO, LLC* (Cause No. 2019-24707, pending in the 164th District Court of Harris County, Texas)

19. *Villaloboz vs. KMCO, LLC* (Cause No. 2019-24075, pending in the 270th District Court of Harris County, Texas)

20. *Weiser Security Service, Inc. v. KMCO, LLC and KMTEX, LLC* (Cause No. 2020-24729, pending in the 164th Judicial District of Harris County, Texas)

21. *Willie Ruth Williams, et al. v. KMCO, LLC DBA Texas KMCO, LLC and John E. Foley* (Cause No. 2019-89982, pending in the 215th District Court of Harris County, Texas)

Schedule 4.1(c)(iii):

Seller is subject to various regulatory enforcement actions (alleging various violations of laws) and has received written notices from governmental authorities in connection therewith.  Pending enforcement actions and notices of alleged violations of law against Seller include:

- *Eugene Scalia, Secretary of Labor, United States Department of Labor vs. KMCO, LLC* (OSHA Docket No. 19-1681, pending before the Occupational Safety & Health Review Commission)

- *Harris County, Texas v. KMCO, LLC* (Cause No. 2019-78741, pending in the 129th Judicial District of Harris County, Texas)

- *Harris County Texas vs. KMCO, LLC* (Cause No. 2019-33228, pending in the 152nd District Court of Harris County, Texas)

- *In the Matter of an Enforcement Action Against KMCO, LLC*; RN 101613511 (TCEQ Docket No. 2018-0804-IHW-E, before the Texas Commission on Environmental Quality)

- *State of Texas vs. KMCO, LLC* (Cause No. D-1-GN-19-001795, pending in the 126th District Court of Travis County, Texas)

- January 14, 2019 TCEQ Notice of Enforcement.

- February 5, 2019 TCEQ Exit Interview

- March 18, 2019 TCEQ Notice of Violation

- August 30, 2019 TCEQ Notice of Enforcement

- October 7, 2019 TCEQ Notice of Violation

- Notice of potential liability from Crain, Caton & James, on behalf of Colorado County, Texas, dated March 17, 2020, addressed to Jeff McFerrin of Ramsey Properties, LLC and referencing Cause No. D-1-GN-19-002002; *State of Texas and Lower Colorado River Authority vs. David Polston, Inland Environmental and Remediation, Inc., and Inland Recycling, LLC*; in the 53rd District Court of Travis County, Texas.

**Schedule 4.1(d)**

**Title**

The Property is subject to certain Encumbrances in favor of: (i) BSP Agency, LLC, as administrative agent for certain secured lenders pursuant to the BSP Credit Agreement; and (ii) Cadence Bank, N.A., as lender pursuant to the Cadence Credit Agreement.

The Property is subject to the following mechanics' liens:

| Number : | Case Name or Lienholder's Name: | Case No. (if applicable) : | Court: | Plaintiffs' Attorneys: (Contact Information) | Lien Amount: |
|---|---|---|---|---|---|
| 1 | US Fire Pump Company, LLC v. KMCO, LLC | 4:19-CV-02857 | Southern District of Texas Houston Division | Firm: McCathern Law Firm<br><br>Lead Attorney: Isaac Villarreal<br><br>Address: 2000 West Loop South, Suite 1850 Houston, TX 77027<br><br>Email: ivillarreal@mccathernlaw.com<br><br>Telephone: 832-533-8689 | $1,122,985.51, plus costs |
| 2 | Mesa Mechanical, Inc. v. KMCO, LLC | 2019-78298 | 125th Judicial District Harris County | Firm: Andrews Myers, P.C.<br><br>Lead Attorney: W. Jason Walker<br><br>Address: 1885 Saint James Place, 15th Floor Houston, TX 77056<br><br>Email: JWalker@andrewsmyers.com<br><br>Telephone: 713-850-4234 | $677,465.68 |
| 3 | Dejean Company – | N/A | N/A | Firm: Andrews Myers | $274,367.83 |

| Number: | Case Name or Lienholder's Name: | Case No. (if applicable): | Court: | Plaintiffs' Attorneys: (Contact Information) | Lien Amount: |
|---|---|---|---|---|---|
| | Service & Maintenance, Inc. | | | Lead Attorney: William Westcott<br><br>Address: 1885 Saint James Place, 15th Floor Houston, TX 77056<br><br>Email: bwestcott@andrewsmyers.com<br><br>Telephone: 713-850-4215 | |
| 4 | Majesty Investments, LLC d/b/a/ Clear Creek Equipment | N/A | N/A | Firm: Coats-Rose<br><br>Lead Attorney: Richard A. Fulton<br><br>Email: rfulton@coatsrose.com<br><br>Address: 9 Greenway Plaza, Ste 1000, Houston, Texas 77046<br><br>Telephone: 713-653-5759 | $15,670.70 |
| 5 | Chubes Equipment Co., Inc. d/b/a Norman Smith Equipment Co. | N/A | N/A | Firm: McCormick, Landry, Munoz PLLC<br><br>Lead Attorney: Andrew McCormick<br><br>Address: 4950 Bissonnet St., Ste A Bellaire, TX 77401<br><br>Telephone: 713-523-0400 | $104,082.19 |
| 6 | Gator Specialty | N/A | N/A | N/A | $167,882 |

| **Number:** | **Case Name or Lienholder's Name:** | **Case No. (if applicable):** | **Court:** | **Plaintiffs' Attorneys: (Contact Information)** | **Lien Amount:** |
|---|---|---|---|---|---|
| | Services, LLC | | | | |

11

**Schedule 4.1(e)**

## **Real Property**

On occasion, the Seller leases a portion of the Property to a farmer to allow for cattle grazing.

**Schedule 4.1(f)**

## **Tangible Personal Property**

None.

**Schedule 4.1(g)**

**<u>Litigation</u>**

The Actions are incorporated herein by reference.

**Schedule 4.1(h)**

**<u>Permits</u>**

The disclosures set forth in Schedule 4.1(c)(ii) and Schedule 4.1(c)(iii) are incorporated herein by reference.

**Schedule 4.1(m)**

**<u>Environmental Matters</u>**

The disclosures set forth in Schedule 4.1(c)(ii) and Schedule 4.1(c)(iii) are incorporated herein by reference.

**Schedule 4.4(b)**

**<u>Hired Active Employees</u>**

Personnel

Brad Griffith

Danny McMullan

Kennith Hartsaw

Jason Beck

Michael Andrews

Mark Kaulen

Greg Swindull

Wayne Mauboules

Saul Wilkerson

Raymond West

Darrin Fisher

Connor McKenna

Matt Wallace

Kelvin Haynes

Stephane Simon

Ken Ownby

Paul Hembling

Diana Doucette

Darin Curry

Randell Bergeron

Dodie Gober

Billy Nash

17

# Exhibit 2

## EXHIBIT A

## Real Property

TRACT 1

BEING A 135.3067 ACRE (5,893,960 SQUARE FEET) TRACT OF LAND SITUATED IN THE B.F. TANKERSLEY SURVEY, A-770, HARRIS COUNTY, TEXAS, AND BEING ALL OF A CALLED 28.9185 ACRE TRACT AS DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. E526074, ALL OF A CALLED 47 ACRE TRACT RECORDED IN VOLUME 1975, PAGE 138 OF THE HARRIS COUNTY DEED RECORDS AND ALL OF A CALLED 17.5305 ACRE TRACT DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. E-526074 OF THE HARRIS COUNTY DEED RECORDS, AND ALL OF A CALLED 59.81 ACRES AS DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. S121754; SAID 135.3067 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED MY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 5/8 INCH IRON ROD FOUND IN THE SOUTH RIGHT-OF-WAY LINE OF CLARA WILSON ROAD (CALLED 60 FEET WIDE), ALSO BEING IN THE WEST RIGHT-OF-WAY LINE OF RAMSEY ROAD, VARYING WIDTH (CALLED 60 FEET WIDE), SAME BEING THE NORTHEAST CORNER OF SAID 28.9185 ACRE TRACT AND THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 03 DEGREES 01 MINUTE 13 SECONDS EAST, ALONG THE SAID WEST RIGHT-OF-WAY LINE OF RAMSEY ROAD, SAME BEING THE EAST LINE OF SAID 28.9185 ACRE TRACT, A DISTANCE OF 1354.04 FEET TO A FENCE CORNER IN THE NORTH RIGHT-OF-WAY LINE OF T & NO RR (100 FEET WIDE)  FOR THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 46 DEGREES 46 MINUTES 42 SECONDS WEST, ALONG THE SOUTH LINE OF SAID 28.9185 ACRE TRACT, SAID 47 ACRE TRACT AND SAID 59.81 ACRE TRACT, SAME BEING THE NORTH RIGHT-OF-WAY LINE OF SAID T & NO RR, A DISTANCE OF 3,341.04 FEET TO A 5/8 INCH IRON ROD SET FOR THE SOUTHWEST CORNER OF SAID 59.81 ACRE TRACT AND THE HEREIN DESCRIBED TRACT;

THENCE NORTH 02 DEGREES 51 MINUTES 44 SECONDS WEST, ALONG THE WEST LINE OF SAID 59.81 ACRE TRACT, A DISTANCE OF 3,492.68 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF THE SAID 59.81 ACRE TRACT AND HEREIN DESCRIBED TRACT;

THENCE NORTH 86 DEGREES 31 MINUTES 49 SECONDS EAST, ALONG THE NORTH LINE OF SAID 59.81 ACRE TRACT AND SAID 47 ACRE TRACT, SAME BEING THE SOUTH RIGHT-OF-WAY LINE OF SAID CLARA WILSON ROAD, A DISTANCE OF 1,428.72 FEET TO A 5/8 INCH IRON ROD FOUND FOR CORNER;

THENCE SOUTH 03 DEGREES 13 MINUTES 25 SECONDS EAST, A DISTANCE OF 907.50 FEET TO A 5/8 INCH IRON ROD SET FOR AN INTERIOR CORNER;

THENCE NORTH 86 DEGREES 05 MINUTES 45 SECONDS EAST, A DISTANCE OF 299.66 FEET TO A 5/8 INCH IRON ROD SET IN THE EAST LINE OF SAID 47 ACRE TRACT, SAME BEING THE WEST LINE OF SAID 28.9185 ACRE TRACTS FOR AN INTERIOR CORNER;

THENCE NORTH 02 DEGREES 38 MINUTES 41 SECONDS WEST, ALONG THE SAID EAST LINE OF SAID 47 ACRE TRACT, SAME BEING THE WEST LINE OF SAID 28.9185 ACRE TRACT, A DISTANCE OF 907.50 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE COMMON NORTH CORNER OF SAID 47 AND 28.9185 ACRE TRACTS, SAME BEING IN THE SOUTH RIGHT-OF-WAY LINE OF SAID CLARA WILSON ROAD;

THENCE NORTH 86 DEGREES 49 MINUTES 45 SECONDS EAST, ALONG THE NORTH LINE OF SAID 28.9185 ACRE TRACT, SAME BEING THE SAID SOUTH RIGHT-OF-WAY LINE OF SAID CLARA WILSON ROAD, A DISTANCE OF 804.71 FEET TO THE POINT OF BEGINNING AND CONTAINING 135.3067 ACRES (5,893,960 SQUARE FEET) OF LAND, MORE OR LESS.

TRACT 2

BEING A 10.7261 ACRE (467,230 SQUARE FEET) TRACT OF LAND SITUATED IN THE TIPTON WALKER SURVEY, A-853, HARRIS COUNTY, TEXAS, AND BEING OUT OF A CALLED 23.5 ACRE TRACT DESCRIBED IN DEED TO IGNAC MICHALSKY RECORDED IN VOLUME 674, PAGE 586 OF THE DEED RECORDS OF HARRIS COUNTY, TEXAS; SAID 10.7261 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 3/4 INCH IRON ROD FOUND IN THE NORTH RIGHT-OF-WAY LINE OF T & NO RR (100 FEET WIDE) AND THE EAST RIGHT-OF-WAY LINE OF RAMSEY ROAD VARYING WIDTH (CALLED 60 FEET WIDE);

THENCE NORTH 02 DEGREES 29 MINUTES 08 SECONDS WEST, ALONG THE EAST RIGHT-OF-WAY LINE OF SAID RAMSEY ROAD, A DISTANCE OF 889.83 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 86 DEGREES 43 MINUTES 06 SECONDS EAST, A DISTANCE OF 1050.26 FEET TO A 1 INCH IRON PIPE FOUND IN THE NORTH RIGHT-OF-WAY LINE OF SAID T & NO RR FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 46 DEGREES 46 MINUTES 42 SECONDS WEST, ALONG THE NORTH RIGHT-OF-WAY LINE OF SAID T & NO RR RIGHT-OF-WAY, A DISTANCE OF 1385.93 FEET TO THE POINT OF BEGINNING AND CONTAINING 10.7261 ACRES (467,230 SQUARE FEET) OF LAND, MORE OR LESS.

TRACT 3

BEING A 1.1503 ACRE (50,108 SQUARE FEET) TRACT OF LAND SITUATED IN THE B. F. TANKERSLEY SURVEY, A-770, HARRIS COUNTY, TEXAS, AND BEING OUT OF A CALLED 6.17 ACRE TRACT OUT OF THE LARS NELSON ESTATE SUBDIVISION, RECORDED IN VOLUME 243, PAGE 417 OF THE DEED RECORDS OF HARRIS COUNTY, TEXAS; SAID 1.1503 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 5/8 INCH IRON ROD SET IN THE SOUTH RIGHT-OF-WAY LINE OF CROSBY–DAYTON ROAD (100 FEET WIDE) AND BEING IN THE WEST RIGHT-OF-WAY LINE OF RAMSEY ROAD, VARYING WIDTH (CALLED 60 FEET WIDE);

THENCE SOUTH 01 DEGREE 53 MINUTES 42 SECONDS EAST, ALONG THE WEST RIGHT-OF-WAY LINE OF SAID RAMSEY ROAD, A DISTANCE OF 294.83 FEET TO A 5/8 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 87 DEGREES 15 MINUTES 27 SECONDS WEST, A DISTANCE OF 302.47 FEET TO A ¾ INCH IRON PIPE FOUND FOR THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 01 DEGREES 43 MINUTES 23 SECONDS WEST, A DISTANCE OF 36.64 FEET TO A 5/8 INCH IRON ROD SET IN THE SOUTH RIGHT-OF-WAY LINE OF SAID CROSBY–DAYTON ROAD FOR THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 47 DEGREES 07 MINUTES 11 SECONDS EAST, A DISTANCE OF 400.50 FEET ALONG THE SOUTH RIGHT-OF-WAY LINE OF SAID CROSBY–DAYTON ROAD TO THE POINT OF BEGINNING AND CONTAINING 1.1503 ACRES (50,108 SQUARE FEET) OF LAND, MORE OR LESS.

TRACT 4

BEING A 13.9529 ACRES (607,790 SQUARE FEET) TRACT OF LAND SITUATED IN THE B.F. TANKERSLEY SURVEY, A-770, HARRIS COUNTY, TEXAS, AND BEING OUT OF A CALLED 19.66 ACRE TRACT AS DESCRIBED IN DEED RECORDED IN VOLUME 8275, PAGE 388 OF THE HARRIS COUNTY DEED RECORDS; SAID 13.9529 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED MY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A 5/8 INCH IRON ROD SET IN THE SOUTH RIGHT-OF-WAY LINE OF CROSBY–DAYTON ROAD (100 FEET WIDE), BEING IN THE WEST LINE OF LOT 2 OF THE DIVISION OF THE SAID TANKERSLEY SURVEY, BEING THE NORTHWEST CORNER OF SAID 19.66 ACRE TRACT AND BEING THE NORTHEAST CORNER OF A CALLED 6.00 ACRE TRACT TO RANDOLF RUCKA AS DESCRIBED IN DEED RECORDED IN CLERKS FILE NO. S876401 OF THE HARRIS COUNTY DEED RECORDS AND BEING THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 46 DEGREES 43 MINUTES 46 SECONDS EAST, ALONG THE SOUTH RIGHT-OF-WAY LINE OF SAID CROSBY–DAYTON ROAD, A DISTANCE OF 235.94 FEET TO A 5/8 INCH IRON ROD SET FOR THE MOST NORTHERLY NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 02 DEGREES 53 MINUTES 30 SECONDS EAST, A DISTANCE OF 486.17 FEET TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHWEST CORNER OF A CALLED 7.091 ACRE TRACT DESCRIBED IN FILM CODE NO. 20110012053 OF THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF HARRIS COUNTY, TEXAS, FOR AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 87 DEGREES 20 MINUTES 29 SECONDS EAST, ALONG THE SOUTH LINE OF SAID 7.091 ACRE TRACT, A DISTANCE OF 681.11 FEET TO A FENCE POST FOUND IN THE EAST LINE OF SAID 19.66 ACRE TRACT, THE WEST LINE OF THE EAST CANAL RIGHT-OF-WAY FOR THE MOST EASTERLY NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 02 DEGREES 25 MINUTES 41 SECONDS EAST, ALONG THE WEST LINE OF SAID CANAL, SAME BEING THE EAST LINE OF SAID 19.66 ACRE TRACT, A DISTANCE OF 575.14 FEET TO A 5/8 INCH IRON ROD SET IN THE NORTH LINE OF A 0.0033 ACRE TRACT DESCRIBED AS TRACT 9 RECORDED UNDER CLERKS FILM CODE NO. 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 OF THE HARRIS COUNTY DEED RECORDS FOR THE MOST EASTERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 44 DEGREES 39 MINUTES 39 SECONDS WEST, ALONG THE WEST LINE OF SAID 0.0033 ACRE TRACT, A DISTANCE OF 70.53 FEET TO A 5/8 INCH IRON ROD FOUND IN THE SOUTH LINE OF SAID 19.66 ACRE TRACT, SAME BEING THE SOUTH LINE OF B.F. TANKERSLEY SURVEY, SAME BEING THE NORTH LINE OF THE J. QUINLAN SURVEY, ABSTRACT NO-641 FOR THE MOST SOUTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 87 DEGREES 10 MINUTES 13 SECONDS WEST, ALONG THE SOUTH LINE OF SAID 19.66 ACRE TRACT, SOUTH LINE OF B.F. TANKERSLEY SURVEY, NORTH LINE OF J. QUINLAN SURVEY, A DISTANCE OF 803.70 FEET TO A 3/4 INCH IRON PIPE FOUND, BEING THE SOUTHEAST CORNER OF SAID 6.00 ACRE TRACT AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 02 DEGREES 55 MINUTES 06 SECONDS WEST, ALONG THE WEST LINE OF SAID 19.66 ACRE TRACT, SAME BEING THE EAST LINE OF SAID 6.00 ACRE TRACT, A DISTANCE OF 957.94 FEET TO THE POINT OF BEGINNING AND CONTAINING 13.9529 ACRES (607,790 SQUARE FEET) OF LAND, MORE OR LESS.